Veronica WALLACE, Plaintiff,

v.

THE METHODIST HOSPITAL
SYSTEM, Defendant.

No. CIV.A. H–97–0095.

United States District Court,
S.D. Texas,
Houston Division.

Feb. 25, 2000.

Beatrice Mladenka–Fowler, Mladenka–Fowler & Associates, Shannon Breaux Sauceda, Mladenka–Fowler Adams & Associates, Houston, TX, for Veronica A. Wallace, plaintiff.

Tom M. Davis, Jr., Davis Oretsky et al., Houston, TX, for the Methodist Hospital System, Donna Hahus, defendant.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

In this pregnancy discrimination case, plaintiff Veronica A. Wallace sued her former employer, The Methodist Hospital System ("Methodist"), for wrongful termination, alleging violations of section 701(k) of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e(k), and section 5.01 of the Texas Commission on Human Rights Act, TEX. LABOR CODE ANN. § 21.051 (Vernon's 1996). (Docket Entry No. 1). Methodist terminated Wallace's employment as a nurse in the Medical Intensive Care Unit in December 1994, near the end of Wallace's third pregnancy in three years. Wallace alleged that Methodist terminated her employment because of her repeated pregnancies. Methodist responded that it discharged Wallace because she violated hospital policy by carrying out a medical procedure that required a doctor's order without obtaining such an order and by falsifying a medical record to show that a doctor's order had been given. A first trial ended in a hung jury and mistrial. The jury in the second trial found in favor of Wallace, awarding her $70,000 in compensatory damages and $437,500 in punitive damages. Methodist has moved for judgment as a matter of law ("JMOL") under Rule 50(b) of the Federal Rules of Civil Procedure. (Docket Entry No. 117).

Methodist and Wallace filed a number of briefs addressing the post-verdict issues. (Docket Entry Nos. 119, 127, 130, 131, 132, 133).[1] Based on a careful consideration of

---

1. Wallace moved under Rule 5(a) of the Federal Rules of Civil Procedure to strike portions of the trial transcript that were referenced in Methodist's May 4, 1999 brief, (Docket Entry No. 127), but not attached to the brief or served on Wallace. (Docket Entry No. 128). This court cannot strike the trial transcript from the record; it is part of

the motion, the briefs, the parties' submissions, the trial record, and the applicable law, this court GRANTS Methodist's motion for judgment as a matter of law.[2] The reasons are set out below.

## I. Background: The Evidence at Trial

Wallace began working at Methodist in March 1986 as a blood collector. (Tr. 183).[3] She later moved to the neurophysiology department, working there as an EEG technician until 1991. (Tr. 183–185). She entered nursing school in 1990 and became a student professional nurse in the intensive care unit in 1991. (Tr. 187–188, 192). Wallace received her Bachelor of Science in Nursing in April 1992. (Tr. 193).

Wallace accepted a job as a registered nurse ("RN") in Methodist's medical intensive care unit ("MICU") on October 1, 1992. (Tr. 204; P.Ex. 2). Wallace was pregnant when she began working in the MICU. Nurse Manager Donna Hahus supervised the approximately thirty-two nurses in the MICU. Tory Schmitz was Wallace's direct supervisor.

Wallace took a three month leave after the birth of her first child, from February 23, 1993 to June 5, 1993. (Tr. 1049; D. Ex. 15). Wallace received full pay and benefits throughout her maternity leave, using accumulated sick time, holiday time, and vacation time. (Tr. 219, 1049). When Wallace returned to work in June 1993, she used options Methodist made available to change her shift time from day to evening and began working a compressed-time schedule of three twelve-hour shifts, primarily on weekends. (Tr. 221–22, 246–47, 561–62).

Wallace testified that Hahus had become "less friendly" when Wallace returned to work after her first maternity leave, which Wallace asserted as evidence of Hahus's discriminatory animus. Wallace also testified that Hahus and Methodist allowed Wallace to work the hours and shifts she wanted when she returned from leave in June 1993. Wallace testified that, in her March 1994 evaluation, Schmitz and Hahus made statements that evidence discrimination. Wallace testified that Schmitz stated that Wallace was difficult to categorize because of her pregnancy-related absences, (Tr. 237), and that Hahus said she needed to "choose between nursing and family." (Tr. 227, 235–37). Schmitz acknowledged that Wallace's absences made it difficult to apply certain objective evaluative criteria to her. (Tr. 1003). Hahus denied making the statement attributed to her, instead testifying that she and Schmitz had some concerns about Wallace's recent performance that they raised in the meeting with Wallace. Wallace's evaluation score dropped 10 points from a year earlier, when she was also pregnant. However, Hahus and Schmitz testified that they gave Wallace satisfactory evaluations. There is no suggestion in the record that Wallace received a poor evaluation, that she missed any pay raise, or that her performance evaluations were a factor in the discharge decision.

The trial testimony was also undisputed that during Wallace's three-month maternity leave for the birth of her second child, from March 2, 1994 to June 5, 1994, Hahus helped Wallace maximize the amount of leave time for which she could be paid. During this maternity leave, Wallace had

the record. Wallace's motion to strike portions of the trial transcript is DENIED.

Wallace also moved to strike newspaper articles that were attached to Methodist's May 4, 1999 filing. (Docket Entry No. 130, p. 20). This court did not consider those articles in deciding the motion for judgment as a matter of law. Wallace's motion to strike the articles is DENIED as MOOT.

**2.** Because this court finds that there was insufficient evidence to hold Methodist liable, this court does not reach the parties' motions as to damages. (Docket Entry No. 115).

**3.** "Tr. ___" refers to the transcript of the December 1998 trial, found at Docket Entry Nos. 121–126. Plaintiff's exhibits and defendants' exhibits from this trial are referred to as "P.Ex. ___" and "D. Ex.___," respectively.

less accumulated time to draw upon than she had had during her first leave. Although a substantial part of the second maternity leave was unpaid, Hahus classified Wallace's maternity leave as excused absences rather than as unpaid leave, which allowed Wallace to continue accruing benefits, including vacation time, during her leave. (Tr. 1050). With Hahus's help, Wallace was able to increase the paid portion of her maternity leave. (Tr. 1050; D. Ex. 17).

Wallace returned to work on June 5, 1994. She learned that she was pregnant a short time later. (Tr. 248). When Wallace returned to work, she again used the compressed-time scheduling option to work the hours she chose—three 12-hour shifts each week instead of five 8-hour shifts. (Tr. 246, 626). Wallace received merit raises during this period. (Tr. 246). She continued to work full-time, on the schedule she selected, until her discharge.

Methodist fired Wallace on December 21, 1994, (D.Ex. 22), following an incident that occurred two days earlier. On December 19, 1994, Wallace performed a procedure on a patient without a physician's order to do so, and wrote in the patient's chart that a doctor had given Wallace a verbal order to do the procedure. Wallace had no such order when she made the entry and did the procedure. Wallace did not dispute that the incident occurred. However, she claimed that Methodist used the incident as a pretext for discrimination, in fact firing her because Donna Hahus "resented [her] being pregnant." (Tr. 252). At trial, Wallace presented evidence that she claimed demonstrated disparate discipline, that other nurses had similarly performed procedures without obtaining doctor's orders in advance, but with no adverse consequences. Wallace also pointed to the negative comments by Hahus and Schmitz in March 1994, and to comments in August 1994 and shortly after the discharge as "direct evidence" of discriminatory motive. (Docket Entry No. 119, p. 7).

Methodist contended that the decision to discharge Wallace had nothing to do with her pregnancies. Methodist told Wallace that she had been terminated because, on December 19, 1994, she "falsif[ied] a hospital record by writing a verbal order for a specific procedure that required a physician's order under hospital policy [ ] and then implement[ed] the procedure without a physician's knowledge or consent." (Docket Entry No. 117, p. 2). Methodist gave the same reason for Wallace's discharge at trial and in this motion.

Much of the relevant evidence as to the December 19, 1994 incident is undisputed. Wallace worked the 7:00 a.m. to 7:00 p.m. shift in the MICU that day. A patient of Dr. Kenneth Scott Lloyd, identified in the record as "Mr. B," was in the unit recovering from surgery on his aorta. (Tr. 718). Dr. Lloyd is an internal medicine and pulmonary disease specialist. (Tr. 715). By Dr. Lloyd's order, a Salem sump—a tube threaded through the nose to the stomach—had previously been inserted into Mr. B. The Salem sump permitted the doctors and nurses to deliver medicine to Mr. B, to check the amount of fluids in his stomach, and to decompress his stomach if gastric residuals built up. (Tr. 721–22, 851–53). If gastric residuals built up in the stomach and were not promptly suctioned out, Mr. B risked aspiration pneumonia, which he had previously contracted. (Tr. 720).

At 11:00 a.m. on December 19, Dr. Albert Barroso, a gastroenterologist assisting Dr. Lloyd, issued a written order to begin tube feeding Mr. B. (Tr. 872; D. Ex. 1, tab 32). The written order said nothing about removing the Salem sump, which can be used as a feeding tube, (Tr. 272), or about inserting a different tube. At 4:00 p.m., without checking with any doctor, Wallace removed the Salem sump from Mr. B and replaced it with a small bore feeding tube. (Tr. 273–74). In the patient's record, Wallace wrote a "verbal order," a written statement that she had received an oral order from a doctor, to

"place feeding tube and follow-up with X-ray." Wallace wrote the order to show that Dr. Nicola Hanania, a medical fellow in the MICU, had given the verbal order. (Tr. 273–74; D. Ex. 1, tab 32). Wallace signed her name next to the chart entry. (D. Ex. 1, tab 32).

At trial, Wallace admitted that Dr. Barroso, in his written order, had only ordered her to "begin tube feeding," not to replace the Salem sump with a small bore feeding tube. (Tr. 263–64). Wallace admitted that it was possible to use a Salem sump for feeding. (Tr. 272). Wallace admitted that, contrary to the written entry she made on Mr. B's chart, Dr. Hanania had not given her any verbal order to place a small bore feeding tube in the patient. (Tr. 388). Wallace also acknowledged that removing the Salem sump was not an emergency procedure, that there was time to ask a doctor before she proceeded, and that there were doctors readily available for consultation before she removed the Salem sump and replaced it with a small bore tube. (Tr. 379–83).

Wallace's testimony was clear:

Q: All right. And it says on [the counseling record] that, "On December 19th, made false entry in medical record. VW performed a procedure on a patient without a physician's order, then wrote as a verbal order. No verbal order had been given."

Now, the factual part of that is correct, is it not, that you did perform a procedure on the patient without a physicians's order; is that correct?

A: Correct.

Q: All right. And then you wrote a verbal order?

A: Correct.

Q: And that no verbal order had been given, that's all correct, is it not?

A: Yes, that's correct.

Q: Okay. Now, did you sign that document?

A: Yes, I did.

(Tr. 388).

When Dr. Lloyd made his rounds in the late afternoon or evening of December 19, he noticed that the Salem sump had been removed from Mr. B and had been replaced with a small bore feeding tube. (Tr. 722). Dr. Lloyd looked at the patient's chart and saw the written entry, signed by Veronica Wallace, stating that Dr. Hanania had given a verbal order to remove the Salem sump and replace it with the small bore feeding tube. Dr. Lloyd quickly found Dr. Hanania and asked why he had given nurse Wallace the order to change the patient's tube. (Tr. 745–46). Dr. Hanania explained that he had given no such order. (Tr. 807). Dr. Lloyd then went to talk to Wallace.

Dr. Lloyd and Wallace gave conflicting testimony about this conversation. Dr. Lloyd testified that he asked Wallace why she had removed the Salem sump and inserted the feeding tube without a doctor's order and why she had written a false order on the chart. (Tr. 746–47). Dr. Lloyd testified that Wallace said that "[s]he thought the patient would do better with a smaller feeding tube instead of the nasogastric tube [Salem sump]." (Tr. 747). Dr. Lloyd testified that he told Wallace that "if she writes an order that the doctor did not give her, then that is falsification of a medical record, a lie." (*Id.*). Dr. Lloyd also said that he told her that "it's practicing medicine without a license to write down that you're going to put in tubes and do X-rays" because a nurse "can't just do an X-ray and put a tube in the patient without a physician's order." (*Id.*). Wallace testified that when Dr. Lloyd confronted her, he did not question the order after he confirmed that the placement of the tube was satisfactory, except to blame the fellows, such as Dr. Hanania, for writing in "his" charts. (Tr. 277–79). Mr. B suffered no harm from the tube change.

At trial, Wallace explained that she had planned to have Dr. Hanania cosign the

order before her shift ended at 7:00 p.m. (Tr. 265, 405, 462). However, Dr. Lloyd discovered that the tube had been changed before Wallace had spoken to Dr. Hanania. (Tr. 277–79). Based on this explanation, Wallace denied that her conduct was properly characterized as making a false entry in the patient's chart; even if the chart entry was false when Wallace wrote it, she intended to make it true a short time later by having a doctor authorize the procedure after the fact.[4] Before Wallace finished her shift and talked to Dr. Hanania, Dr. Lloyd discovered that Wallace had performed the procedure without a doctor's order and had written a verbal order in the chart without obtaining such an order. (Tr. 181, 251, 405).

The testimony was undisputed that regardless of what Dr. Lloyd told Wallace on the evening of December 19, 1994, he talked to Tory Schmitz, the MICU clinical supervisor and Wallace's direct supervisor, about the incident the next day. (Tr. 752, 1017). Dr. Lloyd told Schmitz that Wallace "had written an order that was not given, and that she had placed the tube without an order. Ordered an X-ray without an order [sic], ... and that this was practicing medicine without a license." (Tr. 753). Schmitz spoke to Dr. Barroso and Dr. Hanania, both of whom denied having given Wallace an order to change the tube. (Tr. 1018).

Later on December 20, Schmitz told Hahus about the incident. (Tr. 1018). Hahus asked Schmitz to telephone Wallace, who had called in sick for work that day. (*Id.*). Schmitz telephoned Wallace to discuss the incident. (Tr. 1019). Schmitz testified that Wallace admitted that she had removed the Salem sump and that she had

not received an order to do so. (Tr. 1019). Wallace told Schmitz that she would not take such a step again. (Tr. 1020). Schmitz relayed Wallace's statements to Hahus, including that Wallace "admitted that she had written the verbal order, and that she didn't have a verbal order." (Tr. 633).[5]

Hahus consulted Marcella Louis, a nursing director who chaired the Methodist peer review committee, and Paula Hansen, the nursing director and Hahus's supervisor, about the proper response to Wallace's conduct. (Tr. 633–34). The record does not disclose the substance of Hahus's conversation with Louis. Hansen, who did not know that Wallace was pregnant, agreed with Hahus's opinion that termination would be justified if a nurse had written an entry in a patient chart showing a verbal order from a doctor for a procedure that required a doctor's order, without receiving such an order, and had implemented the procedure without such an order. (Tr. 1076–77).[6] After talking to Louis and Hansen, Hahus recommended that Wallace be terminated for violating Methodist's written policies by making a false entry into a patient chart and performing a medical procedure that required a doctor's order without receiving such an order. (Tr. 635).

On December 21, 1994, Hahus telephoned Wallace to tell her that she had been discharged. (Tr. 635–36). On the same date, Wallace received a Due Process Corrective Counseling Record stating that Methodist was terminating Wallace's employment because she had committed a "Class I Violation: Unprofessional Conduct detrimental to patient care." (D.Ex.

---

4. Wallace's expressed intent to obtain Dr. Hanania's signature after she had already performed the procedure does not explain how the order would then be "true": the chart entry reflected that a doctor had ordered the procedure to be performed, not authorized it after the fact.

5. Wallace did not dispute this evidence, although she also recalled that Schmitz criti-

cized Dr. Barrosa for not specifying how he wanted the tube feeding administered. (Tr. 282–83). Schmitz denied criticizing Dr. Barrosa. (Tr. 1020).

6. Hansen also spoke to Leslie Wagner, an employee in human resources, about Wallace. Wagner supported the decision to terminate Wallace. (Tr. 1078–79).

22). The counseling record read: "On December 19, 1994, [Wallace] made false entry in medical record. [Wallace] performed a procedure on a patient without a physician's order then wrote as a verbal order. No verbal order had been given." (*Id.*).

Under Methodist's Official Due Process Procedures, a Class I violation is "a serious violation of System standards under circumstances, that, after thorough consideration of the facts, may justify *termination* for a first violation without regard to the employee's length of service or prior record of conduct." (D. Ex. 4, Official Procedure No. P001, Revision No. 5, p. 2). The procedures provide a nonexhaustive list of 16 types of Class I violations. The list includes: (1) "Willful action or illegal, unprofessional or unethical conduct detrimental to patient care ... that result [sic] in neglect, abuse, or exploitation of any patient;" and (2) "Deliberate omission of information, falsification of employee/employer records, or falsifying information to management regarding their availability for work, job duties, or performance." (D. Ex. 4, Official Procedure No. P001, Appendix A, p. 1). Methodist asserts that Wallace violated both of these provisions by falsifying a verbal order for a medical procedure and undertaking the procedure without a doctor's authorization. The failure to obtain a physician's order for the insertion or removal of a nasogastric feeding tube, which includes a Salem sump, is a violation of Methodist's official written policies. (D. Ex. 4, Policy No. D-707, Revision No. 3, p. 1).

Wallace filed a grievance seeking reversal of her termination and attended an informal grievance meeting with Hahus, Schmitz, Hansen, and Wagner. (Tr. 636, 1076). At that meeting, Wallace argued that other MICU nurses had similarly performed procedures without doctor's orders and had not been terminated. Methodist upheld the termination and denied Wallace's request to "proceed to formal conflict resolution." (Tr. 636; D. Ex. 25).

Methodist presented undisputed evidence that of the thirty-two nurses in MICU working under Donna Hahus's supervision, (Tr. 1000), ninety percent are female, over fifty percent are married, and that from three to seven give birth each year. (Tr. 1046–47). Most of the nurses who give birth take maternity leave and return to work. (Tr. 1023). Wallace did not dispute that in the MICU, Methodist employed a number of other nurses who became pregnant, took maternity leaves and returned to work, without adverse employment consequence, while working under Hahus's supervision. Wallace asserted that her case was different because she became pregnant three times in three years.[7]

Wallace brought this lawsuit on January 14, 1997, asserting that Methodist had discriminated against her because of her pregnancies, in violation of Title VII and the Texas Labor Code. This case was first tried in September 1998, but ended in a mistrial after the jury was unable to reach a verdict. After a second trial, the jury found in favor of Wallace, awarding her $70,000 in compensatory damages and $437,500 in punitive damages. Methodist filed a post-verdict motion renewing its motion for JMOL at the close of evidence, arguing that Wallace did not submit sufficient evidence to support the jury's finding of liability. Methodist argues in the alternative that if this court finds sufficient evidence to support the liability determination, it should partially remit the compensatory damages award and fully remit the punitive damages award.[8]

---

7. Wallace's assertion that Hahus singled her out for discrimination because she was repeatedly pregnant is in tension with Wallace's testimony that Hahus exhibited resentment that showed discrimination toward Wallace

as soon as she returned from her first maternity leave.

8. Wallace concedes that the total damage award exceeds the $300,000 statutory cap applicable to this case, 42 U.S.C.

The court considers Methodist's motion below.

## II. The Applicable Legal Standards

### A. The Standard for a Motion for Judgment As a Matter of Law

"A motion for judgment as a matter of law ... in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Scott v. University of Mississippi*, 148 F.3d 493, 503 (5th Cir.1998) (quoting *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir.1997)) (alteration in original). Under Rule 50 of the Federal Rules of Civil Procedure, a district court "may grant a judgment as a matter of law if after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377–78 (5th Cir.1999) (quoting FED. R. CIV. P. 50).[9] "[A] court should grant a motion for judgment as a matter of law 'not only when the non-movant presents no evidence, but also when there is not a sufficient conflict of substantial evidence to create a jury question.'" *Id.* at 504 (quoting *Travis v. Board of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir.1997), *cert. de-*

nied, 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998)). "Substantial evidence is defined as 'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *Id.* (quoting *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir.1996) (en banc)).

In conducting this review, the district court "accord[s] great deference to the jury's verdict." *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir.1998). The court "view[s] the entire record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and 'leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury.'" *Aetna Cas. & Surety Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 378 (5th Cir.1999) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir.1994)). A court may grant a motion for JMOL "only when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict." *Baltazor*, 162 F.3d at 373; *see also Texas Farm Bureau v. United States*, 53 F.3d 120, 123 (5th Cir.1995).

■ A district court may review a party's post-verdict motion for judgment as a

---

§ 1981a(b)(3)(D), and does not oppose a remittitur to conform to that cap. (Docket Entry No. 119, p. 40–41).

9. Rule 50 provides in part:
(a) Judgment as a Matter of Law.
(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on

which the moving party is entitled to the judgment.
(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
(1) if a verdict was returned:
(A) allow the judgment to stand,
(B) order a new trial, or
(C) direct entry of judgment as a matter of law....

matter of law only if the party first moved for JMOL at the conclusion of all the evidence in the case. *See Allied Bank–West v. Stein,* 996 F.2d 111, 114–15 (5th Cir.1993); *see also United States ex rel. Wallace v. Flintco Inc.,* 143 F.3d 955, 960 (5th Cir.1998). A motion for JMOL at the close of the evidence is a prerequisite to the district court's review of a post-verdict motion for JMOL, being "virtually jurisdictional." *Stein,* 996 F.2d at 114–15 (quoting *Perricone v. Kansas City Southern Railway Company,* 704 F.2d 1376, 1380 (5th Cir.1983)).

"It is well-settled in this circuit that a motion for judgment as a matter of law filed post verdict cannot assert a ground that was not included in the motion for judgment as a matter of law made at the close of the evidence." *Morante v. American Gen. Fin. Ctr.,* 157 F.3d 1006, 1010 (5th Cir.1998). "This requirement both enables the trial court to re-examine the sufficiency of evidence as a matter of law if the jury returns a verdict contrary to the movant and alerts the opposing party to insufficiencies in time to cure defects in proof." *Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.,* 984 F.2d 410, 413 (Fed. Cir.1993); *see also MacArthur v. University of Texas Health Ctr.,* 45 F.3d 890, 896 (5th Cir.1995).

**B. The Title VII standard**

Under Title VII, it is unlawful for any employer "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act of 1978 amended Title VII to provide that pregnancy discrimination was a form of sex discrimination. *See* Pub.L. 95–555, 92 Stat.2076 (codified at 42 U.S.C. § 2000e(k)). The Act provides in pertinent part:

> the terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work ....

42 U.S.C. § 2000e(k).

The Fifth Circuit extensively analyzed the Pregnancy Discrimination Act in *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204 (5th Cir.1998), *cert. denied,* 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998). In that case, an airline ticket agent requested a light duty assignment due to pregnancy-related back pains and lifting restrictions. Continental Airlines, her employer, denied her request. The airline's policy provided for mandatory light duty transfers only for employees who suffered an occupational injury. The Fifth Circuit found that the plaintiff was denied a light-duty assignment under Continental's policy because her back troubles were not work related. The plaintiff failed to establish discrimination under Title VII because she could not prove she was treated differently from any other employee who suffered from non-occupational injuries: "Continental treated Urbano in exactly the same manner as it would have treated any other worker who was injured off the job .... Under [the Pregnancy Discrimination Act], an employer is [only] obliged to ignore a woman's pregnancy and 'to treat the employee as well as it would have if she were not pregnant.'" *Id.* at 206. "Continental was entitled to deny Urbano a light-duty assignment as long as it 'treated similarly affected but nonpregnant employees' the same." *Id.* (quoting *Troupe v. May Dep't Stores,* 20 F.3d 734, 738 (7th Cir.1994)).

Pregnancy discrimination claims are analyzed under "the disparate treatment analysis applied in other Title VII discrimination cases." *LaFleur v. Westridge Consultants, Inc.,* 844 F.Supp. 318, 324 (E.D.Tex.1994). In general, a Title VII plaintiff can prove discrimination in two ways, either by direct evidence or by the indirect or inferential method of proof.

*See Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1217 (5th Cir.1995). If the plaintiff produces sufficient direct evidence to show that unlawful discrimination was a motivating factor in the challenged employment action, the burden of proof shifts to the defendant employer to show by a preponderance of the evidence that it would have made the same decision even if it had not allowed discrimination to play such a role. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[10]

"A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 40 (5th Cir.1996). "Direct evidence is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Nichols,* 81 F.3d at 40; *see also Mooney,* 54 F.3d at 1217; *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993).

10. In *Price Waterhouse,* the Supreme Court held that if an employer showed that it would have made the same decision absent the impermissible discrimination, then the employer had not violated Title VII. *Id.* at 244–45, 109 S.Ct. 1775. Subsections 107(a) and 107(b) of the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e–2(m) and 42 U.S.C. § 2000e–5(g)(2)(B) respectively, amended Title VII to provide that, in such a case, the employer had violated Title VII and to allow the plaintiff to be awarded declaratory relief, injunctive relief, and attorneys' fees, but not other kinds of relief, such as damages or reinstatement. In this case, however, neither side presented a mixed-motive case. Wallace argued at trial, and reurges now, that she was discharged solely because Donna Hahus resented Wallace's three pregnancies in her three years in the MICU. Methodist argued at trial, and reasserts here, that the evidence of discrimination is wholly insufficient in light of the overwhelming evidence that Wallace was discharged because she violated hospital policies.

11. Under this framework, a Title VII plaintiff unable to produce direct evidence of discrimination carries "the initial burden ... of establishing a prima facie case of discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct.

"[B]ecause direct evidence of discrimination is rare, the Supreme Court has devised an evidentiary procedure that allocates the burden of production and establishes an orderly presentation of proof in discrimination cases [when direct evidence is lacking]." *Nichols,* 81 F.3d at 40; *see also Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993). A pregnancy discrimination case brought under Title VII is subject to this burden-shifting approach, developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[11] *See Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.1998); *Scott,* 148 F.3d at 504 (ADEA case); *Travis,* 122 F.3d at 263 (Title VII case). "When a case has been fully tried on the merits, however, '[a court] need not parse the evidence into discrete segments corresponding to' the different stages of the *McDonnell Douglas–Burdine* frame-

1817; *see also Bodenheimer,* 5 F.3d at 957 n. 4. To establish a prima facie case of race discrimination under Title VII, a plaintiff must show the following elements: 1) membership in a protected class; 2) that the plaintiff was qualified for the position at issue; 3) that the defendant made an adverse employment decision despite the plaintiff's qualifications; and 4) that the plaintiff was replaced with a person not a member of the protected class. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The prima facie case, if established, raises a presumption of discrimination that the defendant must rebut by articulating a legitimate, nondiscriminatory reason for the challenged employment action. *See Burdine,* 450 U.S. at 254–56, 101 S.Ct. 1089; *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992–93 (5th Cir.1996) (en banc); *Bodenheimer,* 5 F.3d at 957. If the defendant satisfies this burden, the presumption disappears, and the plaintiff must prove that the proffered reason for the adverse employment action is a pretext for discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–09, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Meinecke v. H & R Block,* 66 F.3d 77, 83 (5th Cir.1995); *Bodenheimer,* 5 F.3d at 957.

work." *Scott*, 148 F.3d at 504 (quoting *Travis*, 122 F.3d at 263). Instead, a court reviewing the verdict in a Title VII case after a trial on the merits "engage[s] in 'traditional sufficiency-of-the-evidence analysis' in determining whether reasonable jurors could find discriminatory treatment." *Travis*, 122 F.3d at 263 (quoting *Rhodes*, 75 F.3d at 993).

The verdict in favor of Wallace will survive Methodist's motion for judgment as a matter of law "if the evidence taken as a whole (1) creates a fact issue as to whether [Methodist's] stated reasons [were] what actually motivated [Methodist] and (2) creates a reasonable inference that [Wallace's pregnancies were] a determinative factor in [her termination]." *Scott*, 148 F.3d at 504 (quoting *Rhodes*, 75 F.3d at 994).[12]

The question before this court is whether, based on the evidence presented at trial, taken as a whole, a reasonable jury could find that pregnancy discrimination was a determinative factor in Methodist's decision to terminate Wallace's employment on December 21, 1996.

## III. Wallace's Assertions of "Direct" Evidence of Discrimination

Wallace argues that the record contains sufficient direct evidence to show that pregnancy discrimination was a motivating factor in Methodist's decision to terminate her employment.[13] Direct evidence is defined in the Fifth Circuit as "evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Portis v. First Nat'l Bank*, 34 F.3d 325, 328–29 (5th Cir.1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)) (alteration in original). "In the context of Title VII, direct evidence includes any statement or written document showing discriminatory motive on its face." *Portis*, 34 F.3d at 329. The plaintiff must show that "the employer *actually relied on* [the forbidden factor] in making its decision." *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1218 (5th Cir.1995) (quoting *Langley v. Jackson State Univ.*, 14 F.3d 1070, 1075 (5th Cir.1994)) (alteration in original).

The term "direct evidence" was introduced to Title VII analysis in Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In that case, Justice O'Connor concluded that the plaintiff had presented direct evidence of sex discrimination sufficient to "require the defendant to show that its decision [to place her on hold as to her partner status] would have been justified by wholly legitimate concerns." *Id.* at 273, 109 S.Ct. 1775, 104 L.Ed.2d 268. The plaintiff presented evidence that "a number of the evaluations [of her] submitted by partners in the [accounting] firm overtly referred to her failure to conform to certain gender stereotypes as a factor militating against

---

12. Wallace asserted claims both under Title VII and under the Texas Commission on Human Rights Act (TCHRA). "The law governing claims under the TCHRA and Title VII is identical." *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n. 2 (5th Cir.1999).

13. Wallace also argues that Methodist has not preserved its right to move for JMOL post-verdict on the ground that the statements Wallace presented as direct evidence of discrimination were too temporally remote from her termination and too remote in subject matter to support a finding of liability. (Docket Entry No. 130, p. 4). While a party may not move for JMOL post-verdict on a ground that was not included in a JMOL motion at the close of the evidence, Wallace interprets the word "ground" too narrowly. Methodist need not have pointed out the reasons Wallace's evidence was not sufficiently probative, but merely needed to identify the issue which was not supported by sufficient evidence. Methodist's motion for JMOL at the close of the evidence clearly stated, "There is no evidence that the hospital considered the fact of [Wallace's] pregnancy" in deciding to discharge her. This courts finds that this statement was sufficient to preserve Methodist's right to move for JMOL post-verdict, and to argue in that motion that Wallace's "direct evidence" was too remote in time and subject matter to support the jury's verdict.

her election to the partnership" and that partner evaluations "were given 'great weight' by the decision makers at [the accounting firm]." *Id.* at 272, 109 S.Ct. 1775. Additionally, "the partner responsible for informing Hopkins of the factors which caused her candidacy to be placed on hold, indicated that her 'professional' problems would be solved if she would 'walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Id.* In the concurrence, Justice O'Connor describes several pieces of evidence that would not show that discrimination had formed a substantial factor in the employment decision, including "stray remarks in the workplace," statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process. *Id.* at 277, 109 S.Ct. 1775. In contrast to such evidence, Justice O'Connor placed "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Id.*

In *Wright v. Southland Corp.,* 187 F.3d 1287 (11th Cir.1999), the court engaged in a thorough and scholarly analysis of the varying definitions of "direct evidence" of employment discrimination. That analysis led the *Southland* court to conclude that in the Eleventh Circuit, courts quoted, but did not in fact apply, the "dictionary definition" of direct evidence. According to the dictionary definition, which the Fifth Circuit frequently quotes in Title VII cases, "direct" means "non-inferential" or "non-circumstantial." This definition seemingly limits "direct evidence" to evidence of a "remark that can only be interpreted as an admission of improper discrimination in the relevant employment decision." *Southland,* 187 F.3d at 1294.

In *Thomas v. National Football League Players Association,* 131 F.3d 198 (D.C.Cir.1997), another case examining the meaning of "direct evidence," the court included the Fifth Circuit among several that limit the term to non-inferential or non-circumstantial evidence. The *Thomas*

court rejected this limited approach, concluding that "the decision to shift the burden [under Price Waterhouse] properly rests upon the strength of the plaintiff's evidence of discrimination, not the contingent methods by which that evidence is adduced." *Id.* at 204. The Eleventh Circuit reached a similar conclusion in *Southland* after collecting the Title VII cases in that circuit involving "direct evidence." The *Southland* court concluded that the courts applied "direct evidence" more broadly than the dictionary definition they quoted would allow. The court settled on a "preponderance definition" as reflecting the courts' actual application of the term: " 'direct evidence' [is] evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." *Southland,* 187 F.3d at 1298. So defined, direct evidence includes any statement by the decisionmaker, reflecting a discriminatory attitude, that ties the discriminatory attitude to the relevant employment decision. *Id.* at 1294. Such evidence, not limited to non-inferential "direct" confessions of discrimination, is generally "sufficient evidence for a trier of fact to conclude more probably than not that the employment decision was based on improper discrimination." *Id.*

A review of the cases suggests that the Fifth Circuit's own application of the term "direct evidence" is not as easily labeled as the D.C. Circuit suggested in *Thomas.* In *Brown v. East Mississippi Electric Power Association,* 989 F.2d 858 (5th Cir.1993), the court characterized as "direct evidence" of discrimination the decisionmaker's frequent, routine use of racial slurs to refer to the plaintiff specifically and to persons in the protected class in general. The court held that the "routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions." *Id.* at 860. However, the Fifth Circuit cases often quote the narrow "dictionary" defini-

tion to limit "direct evidence" to evidence that requires no inference or presumption to prove discrimination. *See, e.g., Sreeram v. Louisiana State Univ. Med. Center-Shreveport,* 188 F.3d 314, 321 (5th Cir. 1999); *Nichols,* 81 F.3d at 40; *Portis,* 34 F.3d at 328–29.

The Fifth Circuit cases frequently involve evidence of remarks by a decisionmaker that are offered as "indirect" proof of discriminatory animus or motive. The Fifth Circuit cases analyze the probative value of such remarks as evidence of discrimination according to the extent to which the remarks satisfy the following criteria: the remarks (1) were related to the protected class of persons of which the plaintiff is a member; (2) were proximate in time to the employment decision at issue; (3) were made by an individual with authority over the employment decision at issue; and (4) were related to the employment decision at issue. *See Krystek v. University of Southern Mississippi* 164 F.3d 251, 256 (5th Cir.1999); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996).[14] Evidence of workplace remarks that does not amount to "direct" evidence may nonetheless have probative value in showing that discrimination motivated the challenged employment decision. However, a workplace remark may be so deficient under one or more of the listed criteria—for example, remote in time from the challenged action or not made by a relevant decisionmaker—as to be a stray remark wholly lacking in probative value even as "indirect" evidence of discrimination. *See, e.g., Krystek,* 164 F.3d at 256; *Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 329–30 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999); *Waggoner v. City of*

*Garland,* 987 F.2d 1160, 1166 (5th Cir. 1993).

Against the backdrop of these cases, this court assesses what Wallace classifies as "direct" evidence of discrimination, to examine whether it was sufficient for a reasonable jury to find that pregnancy discrimination caused her discharge. Wallace identifies the following testimony in the trial record as direct evidence of discrimination, (Docket Entry No. 119, pp. 7–8):

1) Wallace testified that after she returned from her first maternity leave, Hahus treated her differently. "[Before Wallace's maternity leave, Hahus] made conversation [,] she greeted when we would pass in the morning[; after the leave,] she no longer did that." (Tr. 221).

2) Wallace testified that during her second annual evaluation, in late February or early March 1994, just before she began her second maternity leave, Schmitz said that she "did not know to categorize [Wallace] because [Wallace] was gone three months last year, and ... would be gone three months again this year." (Tr. 237).

3) Wallace testified that during this same evaluation, Hahus told her that she "needed to choose between nursing and family." (Tr. 227, 235–37).[15]

4) Wallace testified that after she returned from her first maternity leave in June 1993, she worked a compressed time schedule that Methodist made available to its employees— three 12–hour shifts each week instead of five 8–hour shifts. In the summer of 1994, when she returned from her second maternity leave, Ha-

---

14. If a workplace remark squarely meets all four criteria, it is the type of remark the *Southland* court identified as "direct" evidence of discrimination under the "preponderance definition." *See Southland,* 187 F.3d at 1294.

15. Hahus denied making this statement. (Tr. 1070). Hahus acknowledged that she and

Schmitz had concerns about Wallace's performance and addressed these concerns at the evaluation. Hahus testified that she told Wallace that Wallace "needed to make a commitment to the nursing profession," (Tr. 1071), and that Hahus "couldn't treat [Wallace] differently because she had a family." (Tr. 566).

hus told her that she was "costing the hospital money because [she] was receiving full benefits and not giving 80 hour pay periods." (Tr. 247).[16]

5) Wallace testified that on August 8, 1994, Hahus asked, "How stupid could you be?" after Wallace followed a doctor's written order without seeking clarification, when the order admittedly made no sense as written. (Tr. 249–250).

6) Pat Gaskin, a nurse in MICU, testified that in either late December 1994 or early January 1995, she overheard Shawn Forney, a clinical dietician at Methodist, ask Schmitz why Wallace had been fired. According to Gaskin, Schmitz responded, "First of all, she's been pregnant three times in the last three years." (Tr. 672).

Wallace's testimony that Hahus became "less friendly" after Wallace returned from her first maternity leave in June 1993 does not tend to show that Wallace's pregnancies were a motivating factor in Methodist's decision to terminate her in December 1994. Wallace did not dispute Methodist's evidence that nurses working under Hahus's supervision in the MICU frequently took maternity leave and returned to work without problem. Wallace argued that her situation was different because she was the only nurse pregnant three times in less than three years. Wallace did not dispute Methodist's evidence that Hahus accommodated Wallace's scheduling needs after her first and second pregnancies and helped her maximize her paid leave time during her second pregnancy. Wallace argued that her third pregnancy triggered Hahus's resentment. However, under this theory of the case, Wallace's testimony that Hahus displayed a discriminatory animus toward her as soon as Wallace re-

turned from her first maternity leave is of marginal relevance. Even this relevance is undercut by Methodist's undisputed evidence that Hahus treated Wallace favorably in terms of scheduling and benefits even after the alleged change in demeanor, and did not discriminate against other pregnant nurses in the MICU.

■ Wallace's testimony as to Hahus's change in attitude was conclusory and subjective. It was not "direct" evidence under any definition and was not competent "indirect" evidence to support the jury's verdict. *See Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir. 1994) (holding that plaintiff's "own self-serving generalized testimony stating her subjective belief that discrimination occurred" was not sufficient to support a jury verdict in her favor in an ADEA case); *cf. also Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1186 (5th Cir.1997) (stating that "a broad, generalized statement that black employees were 'watched' more closely that whites is incompetent to establish a pattern of [race] discrimination" under Title VII).

This court concludes that Wallace's generalized, subjective testimony about a change in Hahus's demeanor in June 1993 is not probative of discrimination.

Wallace had her second annual performance evaluation in late February or early March 1994, very shortly before she began her second maternity leave. In the performance evaluation, Hahus and Schmitz rated Wallace's performance as satisfactory but expressed some concerns. Wallace points to two comments made during the performance evaluation as direct evidence of discriminatory animus based on her pregnancies: Schmitz's statement that "she didn't know how to categorize [Wal-

---

**16.** Hahus testified that the compressed time program "was a special program in 1994 as a result of the Clean Air Act that Methodist gave the opportunity for individuals to work three [12–hour shifts] in a week for a total of 72 hours in a pay period, instead of 80 hours, which had previously been mandated if you were in a full-time position. . . . [A nurse on the compressed time program] received full benefits, but only the pay for the hours that [the nurse] worked." (Tr. 626).

lace] because [Wallace] was gone three months last year, and ... would be gone three months again this year," and Hahus's statement that Wallace needed to choose between nursing and family.

■ Schmitz testified that it was "possible" that she made the statement about classifying Wallace. Schmitz explained the statement as follows:

On the performance appraisal at the time—actually, there was an additional part of the evaluation that was a method of awarding points toward promotion. And so, the performance appraisal counted for part of that, but there were other factors that were figured in towards promotion.

One of the factors was experience, and there was a cutoff between two years of experience and less than two years. And Veronica had started two years before, but had some absences. And I just was thinking, well, I'm not sure since leave of absence is not counted toward benefit accumulation that I wasn't sure how to count it in this specific thing. It turns out she got credit for the two years, and it wasn't a factor. But that's the only thing that I can think of that that comment would refer to.

(Tr. 1003). Schmitz's statement did not refer expressly to Wallace's pregnancies, but to the absences resulting from her pregnancies.[17] Schmitz did not express a discriminatory attitude towards Wallace's pregnancies. Schmitz did not make the decision to terminate Wallace. The statement at issue was made ten months before the termination. The statement is not direct or "indirect" evidence of pregnancy discrimination; it is not probative of discriminatory animus.

■ Wallace testified that during the same performance appraisal meeting, Ha-

hus told her that she "needed to choose between work and family." (Tr. 227, 235–37). This statement differs from those discussed above. Although Hahus's statement does not refer explicitly to Wallace's pregnancies, it can be interpreted to show discriminatory animus because "it invoked [a] widely understood stereotype[ ]." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th Cir.1999). The statement suggested that Hahus, the principal decision-maker in Wallace's termination, believed that Wallace's family commitments were impairing her work performance. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 656–657 (5th Cir.1996). However, Hahus made this remark nearly ten months before Wallace's termination. It is undisputed that in this performance evaluation, Hahus rated Wallace's work as satisfactory and Wallace received a raise. It is also undisputed that after this remark, Hahus helped Wallace maximize the amount of paid time she would receive during her second maternity leave. The record does not disclose a connection between Hahus's statement in the performance evaluation and her later decision to terminate Wallace. The statement may be "indirect" evidence, but is not "direct" evidence of discrimination.

The comment Hahus made on August 8, 1994, cannot be considered evidence of discrimination based on pregnancy. On that day, Wallace, following a doctor's written order, drew blood from a patient to test the digoxin level. The patient had been given digoxin within six hours of the blood draw, which would cause falsely high readings in the digoxin test. Wallace acknowledged that although the doctor's order was questionable on its face, she did not seek clarification before carrying it out. Wallace testified at trial that Hahus, after learning of this incident, asked Wallace,

---

17. The Seventh Circuit has noted that Title VII, as amended by the PDA, "requires the employer to ignore an employee's pregnancy, but ... not her absence from work, unless the employer overlooks the comparable absences of non-pregnant employees." *Marshall v.*

*American Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir.1998) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734. 738 (7th Cir.1994)) (alteration in original); *see also Urbano v. Continental Airlines, Inc.*, 138 F.3d 204 (5th Cir.1998).

"How stupid could you be?" (Tr. 249). Wallace claimed that this remark was direct evidence of discriminatory animus based on pregnancy.

■ This remark did not directly or indirectly refer to Wallace's pregnancies or to pregnancy in general. The record discloses no connection between the statement and Wallace's pregnancies. The remark was made four months before Wallace was discharged. No record evidence suggests that this incident or Hahus's remark about it had anything to do with her decision to discharge Wallace. In the absence of any evidence of a causal connection to Wallace's termination or any relationship to Wallace's pregnancies, Hahus's statement is neither direct nor indirect evidence of discrimination. *See Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996).

Wallace presented testimony by a hospital employee, Pat Gaskin, that she had overheard a conversation between Schmitz and another employee, Shawn Forney, as direct evidence that Hahus decided to discharge Wallace out of resentment of Wallace's repeated pregnancies. Gaskin testified as follows:

Q. Did you hear Ms. Schmitz make a comment about Ms. Wallace as to why she was terminated?

A. Yes.

Q. What did you hear?

A. I heard someone ask why she was fired; and she said, first of all, she's

been pregnant three times in the last three years.

Q. And the someone that you heard ask that, was that Ms. Shawn Forney?

A. Yes

.  .  .  .  .

Q. .... What did Ms. Schmitz respond?

A. She said, "First of all, she's been pregnant three times in the last three years."

Q. And did you hear any more of that conversation?

A. No.

Q. What did you do at that point?

A. I walked away.

(Tr. 671–72).[18]

This court is obligated to "view all of the evidence in the light most favorable to the verdict." *Baltazor,* 162 F.3d at 373. This court does note that both Forney and Schmitz, the actual participants in the conversation, remember this conversation quite differently. Schmitz testified that Forney had asked her *which* nurse had been terminated. (Tr. 1006). Schmitz told her it was Veronica Wallace, but Forney "did not seem to recognize [the name]." (Tr. 1007). Schmitz testified: "I gave [Forney] a physical description: dark hair, big smile. And [Forney] still didn't appear to recognize who that was. And in order to further define that person, I said, 'And she's been pregnant three times in the last three years.'" (*Id.*). At that

---

**18.** Under cross-examination, Gaskin testified that she heard only a small part of the conversation:

Q: And when Ms. Schmitz made that statement ["pregnant three times in three years"], your recollection is that you just walked away; is that correct?

A: Yeah. Because I was kind of surprised to hear that.

Q: But you didn't stay to hear the rest of the conversation.

A: No, I didn't stay.

Q: And you hadn't been listening to the first part of the conversation either?

A: That was all I really heard. I don't know if that was the first part or not.

Q: So that statement was all you really distinctly recall hearing?

A: Yeah. [Forney] asking the question, and [Schmitz] giving the answer.

Q: Did you hear what the context of what Ms. Forney's question was? Do you know what they were talking about?

A: Not by—I just assumed they were talking about Veronica.

(Tr. 687–88).

point, Schmitz claims, Forney recognized who Wallace was and the discussion ended.

Forney also testified at trial. Forney agreed that Schmitz was merely providing "a physical description of Veronica [Wallace]." (Tr. 933). Forney testified that she was "a hundred percent" certain that Schmitz was not conveying to her the reason for Wallace's termination. (*Id.*). Forney stated that if Schmitz had told her that Wallace had been fired because of her pregnancy, she "would have been appalled." (*Id.* at 934). "I would have been talking to everybody about that. I would have been furious. As a woman myself, that is so discriminatory." (*Id.*).

For the purpose of this motion, this court accepts Gaskin's account of the portion of the conversation she overheard. However, Gaskin gave no testimony to establish the basis for, or context of, Schmitz's statement, and Wallace did not otherwise present evidence on these points.

The record discloses that Hahus, not Schmitz, made the decision to discharge Wallace. Schmitz was Wallace's direct supervisor and participated in annual performance evaluations, but the undisputed testimony was that, as Wallace herself pointed out, Wallace's overall performance was "not considered in Ms. Wallace's termination." (Docket Entry No. 119, p. 7). Schmitz called Wallace on December 20, 1994, at Hahus's direction, to ask Wallace about the December 19, 1994 incident and reported to Hahus what Wallace had said. (Tr. 1018, 1021). Schmitz testified without contradiction that she had no further role in the events that led to Wallace's discharge and did not participate in that decision. (Tr. 1021).

■ Gaskin did not testify that Schmitz told Forney that Hahus had told Schmitz that Wallace's repeated pregnancies were a factor in her termination. Schmitz did not repeat a statement Hahus had made to her, revealing Hahus's reasons for the decision. Gaskin's testimony of the conversation she overheard between Schmitz and Forney described Schmitz's opinion of one reason for Wallace's termination. Gaskin's testimony was not direct evidence of Hahus's discrimination.

The Fifth Circuit's decision in *Haas v. ADVO Systems, Inc.*, 168 F.3d 732 (5th Cir.1999), is instructive. In *Haas*, the employer's vice-president told the plaintiff, a 54–year–old job applicant, after an interview, that "his only concern about hiring [the applicant] was [the applicant's] age." *Id.* at 733. The vice-president recommended that the company not hire the plaintiff. However, the company president actually made the decision not to hire the plaintiff. The Fifth Circuit held that, in the absence of any clear indication that the employer "actually relied on" the applicant's age in making its decision, the vice-president's statement was not direct evidence of discrimination.

Schmitz's statement differs from the remark at issue in *Haas* because Schmitz's remark was made after the challenged decision and purported to relate the reasons for the decision. The discriminatory statement in *Haas* was more strongly probative of discrimination—it was made before the challenged decision by an employee who offered a recommendation about the decision and raised questions about whether the employer relied on a forbidden factor. However, the statements are similar to the extent that both were made by a person who was not the principal decisionmaker and the record in both cases failed to show the nature of the connection, if any, between the statement and the challenged decision. Schmitz's statement is substantially less probative of discrimination than the statement in *Haas* rejected as direct evidence. Gaskin's testimony about Schmitz's statement is insufficient, alone or in conjunction with Hahus's statement that Wallace "needed to choose between work and family," to constitute direct evidence showing that pregnancy discrimination was a motivating factor in Methodist's termination of Wallace. Both statements

may be "indirect evidence," and will be considered in this court's assessment of the sufficiency of Wallace's evidence showing that Methodist's asserted nondiscriminatory reasons for discharging her were a pretext for pregnancy discrimination.

## IV. The Evidence of Pretext and Discriminatory Motive

Wallace did not dispute that she wrote the verbal order in Mr. B's chart that provided for the removal of the Salem sump and insertion of a feeding tube, before she had obtained such an order. She admitted that she did the procedure without a doctor's order. She presented two kinds of evidence to show that Methodist used her conduct as a pretext for pregnancy discrimination. First, she argued disparate discipline: her conduct did not violate hospital practice because other nurses outside her protected class had written verbal orders for, and performed, similar procedures without obtaining doctor's orders in advance and without adverse employment consequences. Second, she pointed to the allegedly discriminatory statements made by Schmitz and Hahus, particularly Hahus's statement that Wallace "needed to choose between work and family" and Schmitz's statement to Forney that Wallace's three pregnancies in three years were the primary reason for her discharge.

This court must consider all the record evidence to determine if there is a fact issue about whether Methodist's asserted reasons for discharging Wallace were merely a pretext for pregnancy discrimination. A "mere scintilla" of evidence of pretext will not preclude a JMOL in Methodist's favor. "Even if the evidence is more than a scintilla, '... some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a [JMOL].'" *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (quoting *Neely v. Delta Brick & Tile Co.*, 817 F.2d 1224, 1226 (5th Cir.1987)). The analysis requires a comparison of Methodist's evidence of legitimate, nondiscriminatory reasons for Wallace's discharge with Wallace's evidence of pretext in order to determine whether there is "a conflict in substantial evidence." *Id.*

Methodist's stated reason for discharging Wallace was her violation of hospital policies by falsifying a medical record and by performing a procedure without a doctor's order. The evidence is undisputed that Wallace falsified a patient's chart by writing a doctor's order that had not been given. (Tr. 388, 406). The evidence is also undisputed that she performed a procedure that, under Methodist's official policies, she was prohibited from doing without an order from a physician. (Tr. 388, 408–09).

Methodist policy clearly stated that "[a] physician order is required for the insertion or removal of a nasogastric tube." (D. Ex. 4, Policy No. D–707, Revision No. 3, p. 1). Methodist treated Wallace's conduct as a Class I violation under Methodist's Due Process disciplinary policy, defined as a "serious violation of System standards under circumstances that, after thorough consideration of the facts, may justify *termination* for a first violation without regard to the employee's length of service or prior record of conduct." (D. Ex. 4, Official Procedure No. P001, Revision No. 5, p. 2). Among the examples of Class I violations listed in Methodist's policies are "illegal, unprofessional, or unethical conduct detrimental to patient care or to [Methodist's] operations" and "falsifying information to management regarding ... [job] performance." (D. Ex. 4, Official Procedure P001, Appendix A, p. 1). Methodist classified Wallace's conduct under both these descriptions in finding a Class I violation that justified her termination. Wallace argued pretext: other nurses engaged in similar conduct, but were not discharged.

To prevail in a discriminatory discharge case involving an alleged violation of a "work rule," a plaintiff must show either that the employer did not reason-

ably believe the plaintiff violated the rule or that, if the plaintiff did violate the rule, other employees not in the plaintiff's protected class engaged in similar acts without suffering similar consequences. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090–92 (5th Cir.1995); *see also Simmons v. Rothe Dev., Inc.*, 952 F.Supp. 486, 490 (S.D.Tex.), *aff'd*, 132 F.3d 1456 (5th Cir.1997). To establish disparate discipline, the employee must show that other employees outside the protected class were treated more favorably "under 'nearly identical' circumstances." *Little v. Republic Refining Co.*, 924 F.2d 93, 96–97 (5th Cir.1991) (quoting *Smith v. Wal–Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990)); *see also Mayberry*, 55 F.3d at 1090.

■ Wallace argued that Methodist permitted nurses to perform a variety of procedures without obtaining a doctor's order in advance. However, a careful review of the undisputed testimony is that the procedures Wallace and other witnesses described differed from, and did not include, the removal of a Salem sump and insertion of a small bore feeding tube.

Wallace testified that she had inserted an IV line without receiving a doctor's order. (Tr. 293). However, Hahus testi-fied, without contradiction, that no policy required a physician's order for the insertion of an IV line. (Tr. 644–45). Wallace testified that she had seen other nurses write a verbal order for and perform the following procedures without receiving a doctor's order: concentrating medication to maintain blood pressure level, (Tr. 293–94); concentrating medication to comply with a standing order for fluid restrictions, (Tr. 294, 427–30); drawing blood for lab work, (Tr. 296); and renewing restraints. (Tr. 296–97). Hahus testified, without contradiction, that no Methodist policy required a physician's order for any of these procedures. (Tr. 640–45).[19] Wallace produced no evidence that Methodist policies required a physician's order for any of these procedures.[20] By contrast, written Methodist policy did require a physician's order for the insertion of a nasogastric tube in a nonemergency situation.[21]

Wallace's argument that her action was consistent with nursing practices at Methodist MICU and did not violate any work rule was also flatly contradicted by the testimony of other Methodist nurses at trial. Five nurses were asked whether, in their experience, they had replaced a Salem sump with a small bore feeding tube

---

**19.** As to the example of renewing restraints, Hahus testified that Methodist policy permitted nurses to renew restraints as long as the nurse obtained a doctor's authorizing signature within 24 hours of the renewal. (Tr. 640, 645–46).

**20.** Nurse Pat Gaskin testified that she had seen Schmitz writing orders to restock the MICU medication inventory. (Tr. 669). However, Wallace produced no evidence that a written Methodist policy required a doctor's order in this situation. Methodist policy did require a physician's order for the "administration of medications" and for "medications intended for self administration." (D. Ex. 4, Policy No. D–201,p. 1). Gaskin did not testify that Schmitz wrote orders to administer medications; she testified that Schmitz wrote orders to restock inventory.

**21.** Wallace argued that Methodist failed to preserve its right to move for JMOL post-verdict on the ground that Wallace's evidence of disparate discipline did not involve nurses who falsified a verbal order for and performed procedures that, by hospital policy, required a doctor's order. (Docket Entry No. 130, p. 6). Wallace interprets the word "ground" too narrowly. Methodist, in its motion for JMOL at the close of evidence, stated that "plaintiff ha[d] presented no evidence that any managerial or supervisory personnel with the authority to hire, fire, discharge and supervise, were aware of any specific instances where verbal orders or procedures requiring a doctor's preapproval were ever written and undertaken without attempting to contact the physician, or—and writing the falsification into the record." (Tr. 1097). Methodist also stated that "plaintiff [had] not met its burden of demonstrating that nonpregnant nurses wrote verbal orders for the types of procedures that she was terminated for and absent termination." (*Id.*). These statements were sufficient to preserve Methodist's argument about Wallace's disparate discipline evidence for a post-verdict motion for JMOL.

without receiving a doctor's order to do so. Each answered that she had not. The same five nurses were asked how they had responded upon receiving an order to begin tube feeding a patient who already had a Salem sump in place. Each testified that she had administered the feeding through the Salem sump. During cross-examination by Methodist's counsel, nurse Amy Goggins testified as follows:

Q. Have you ever removed a Salem sump from a patient and switched it out for a small bore feeding tube?

A. Yes.

Q. And were—did you discuss it or at least attempt to talk with a doctor before you did that?

A. Yes. Usually you have an order to do that.

Q. So you would have the order to do that?

A. Yes.

Q. Okay. Have you ever received an order to begin tube feeding?

A. Yes.

Q. If the patient had a Salem sump, would you switch out the tube?

A. Not necessarily.

Q. You would leave the Salem sump in place?

.   .   .   .   .

A. Yes, I would, if there was nothing, you know, if no adverse effects would happen to the patient.

Q. Would it be fair to say, Ms. Goggins, that it's not very difficult to find a doctor in MICU?

A. No, it's not hard to find a doctor.

.   .   .   .   .

Q. If you have any questions about a particular order, what do you do?

A. I get clarification from a doctor.

(Tr. 591–93). Nurses Pat Gaskin, Valerie Hooper, and Linda Coscio gave similar testimony. (Tr. 675–79, 682 (Gaskin); Tr. 602–04 (Hooper); Tr. 971–72 (Coscio)).[22]

Wallace testified that she had seen one nurse, Linda Coscio, write a verbal order to insert a Foley catheter and insert the catheter without having received a doctor's order. (Tr. 292). Wallace admitted that she could not definitively state that Coscio had not received a doctor's order before Wallace began observing her. (Tr. 424–25). Wallace admitted that she did not review the chart to see if a doctor signed the order Coscio wrote. (Tr. 425). Coscio herself denied that she had ever inserted a Foley catheter without first receiving a doctor's order. (Tr. 970–71). Hahus testified that a doctor's order was indeed required for the insertion of a Foley catheter. Hahus also testified that she had never been told, and did not know, of any incident in which a nurse wrote an order for and inserted a Foley catheter without a doctor's order. (Tr. 646–47). Wallace produced no evidence that any nurse supervisors knew of the infraction she alleged and failed to take disciplinary action.

Wallace also testified that she had seen a nurse write a verbal order for, and give, a breathing treatment in an emergency situation, without a doctor's order. (Tr. 295). In her testimony, Hahus indicated that a nurse needed to talk to a doctor before writing an order and performing a procedure only in a nonemergency situa-

22. Wallace's own testimony revealed that her decision to replace the Salem sump with a small bore feeding tube was based on an incomplete and inaccurate understanding of how the devices worked inside a patient. Wallace testified that she based her decision on what she had learned in nursing school, that the Salem sump was placed where it would deliver the food to the stomach area, while the small bore feeding tube would place the feeding directly in the intestine and bypass the stomach. Wallace concluded that a small bore feeding tube was better for Mr. B, who had "gut atrophy" and who might aspirate a feeding delivered to the stomach. (Tr. 347–53). Dr. Lloyd testified that in fact, both the small bore feeding tube and the Salem sump deliver the feeding to the stomach. (Tr. 735–37).

tion. (Tr. 640). Hahus also testified that she did not know of the incident Wallace described in her testimony. (Tr. 643). Wallace presented no evidence that any nurse supervisor knew about that incident and failed to take disciplinary action.

Several nurses testified that they had written verbal orders for x-rays and had those x-rays taken without a doctor's order. (Tr. 528–29, 586–87). The nurses testified that a doctor might order a procedure that required an x-ray follow-up by policy, but would not expressly order the x-ray. In such cases, the nurses testified that they wrote verbal orders for an x-ray. Hahus admitted that she knew nurses sometimes wrote verbal orders for x-rays without speaking to a physician. (Tr. 648). Consistent with the nurses' testimony, Hahus said that nurses did this to verify placement of a endotracheal tube or central line, when those procedures had previously been ordered by a physician. (Tr. 648–49). This practice cannot support Wallace's claim that she did not falsify Mr. B's chart; the verbal order she recorded was not for a procedure that was required by policy as a follow-up to another procedure that had been ordered by a physician. Moreover, Wallace produced no evidence of a written Methodist policy that required a physician's order for all x-rays.[23]

Hahus testified, without contradiction, that a "verbal order," an order given orally by a physician either personally or over the telephone, can be of two general types in nonemergency situations. The first is a verbal order for a medical procedure that requires a physician's order in advance. A doctor must order the procedure before the nurse may record a verbal order and perform the procedure. Although the doctor may sign the order after the fact, the doctor must give the order before it is charted and performed. The second type of verbal order is an order for those aspects of care that do not require a doctor's authorization in advance. Such orders, covering such items as over-the-counter drugs or items like Chapstick, do not require a doctor's order before the medication is provided or the work performed. However, a doctor will typically sign such a verbal order after the fact for insurance or billing purposes. In such a case, the nurse may record a verbal order and provide the nonprescription medication and care, and later receive the doctor's after-the-fact acknowledgment. The second type of verbal order does not apply to procedures that, by Methodist's written policy, require a doctor's order in advance. (Tr. 638–41).

Wallace emphasized one incident in particular as supporting her disparate discipline claim. Cheryl Gray worked as a contract nurse in the MICU in approximately 1994. Gray had a patient in the MICU for whom a doctor had ordered Tylenol, to be given rectally. The patient could not accept the medicine rectally. Gray asked a resident if she could administer the drug by mouth. The resident agreed, but the Tylenol could not be given by mouth because the patient was on a respirator. (Tr. 524). Gray then placed a nasogastric tube in the patient and administered the Tylenol through it. Upon discovering that the tube had been placed, the patient's attending physician asked who had ordered and placed the tube. Gray said she had placed the tube. (Tr. 525). The next day, Hahus and Schmitz each verbally reprimanded Gray about the incident, but she was not terminated or formally disciplined. (Tr. 525).

This incident does not evidence disparate discipline, as Wallace contends.[24]

---

**23.** The only policy entered in the trial record that required a physician's order for an x-ray dealt with the use of a weighted bolus feeding tube and stated: "A physician's order for x-ray verification of tube placement must be obtained when the position of the [weighted bolus] feeding tube cannot be determined by clinical examination." (D. Ex. 4, Policy No. D–711, p. 1). No nurse testified that she wrote a verbal order for an x-ray to verify placement of a weighted bolus feeding tube without receiving a doctor's order.

**24.** The doctor's questioning of Gray's action, like Dr. Lloyd's questioning of Wallace's ac-

Gray's conduct was not "nearly identical" to Wallace's conduct. While Gray inserted a feeding tube without a doctor's order as Wallace did, there is no evidence that Gray also falsified the patient's chart by purporting to record a doctor's verbal order for the procedure. Only Wallace both inserted a tube without a doctor's order and recorded a false verbal order for the procedure. Methodist policy includes falsification of records as an example of a Class I violation that may justify termination. The fact that Gray was not terminated does not show disparate discipline.

Methodist did present undisputed evidence that a nurse who was discovered to have made a false entry in a patient chart was disciplined. (Tr. 607–08). Wallace presented no evidence that Methodist had failed to discharge a nonpregnant nurse who had written an entry in a patient's chart to show that a doctor had given an order for a procedure that required a doctor's order, and performed the procedure, without obtaining the order.[25] In short, there was no "nearly identical" nurse or situation presented in the evidence to support Wallace's disparate discipline argument.

■ Wallace's evidence of pretext, including Hahus's March 1994 statement and Schmitz's statement to Shawn Forney shortly after Wallace was discharged are insufficient, in light of Methodist's considerable and largely undisputed evidence of Wallace's violation of written workplace policies, to show Methodist's asserted reasons for Wallace's termination were a pretext for pregnancy discrimination and to preclude judgment as a matter of law.

It is instructive to distinguish this case from two similar cases in which the Fifth Circuit decided that a Title VII defendant was not entitled to judgment as a matter of law. In *Woodhouse v. Magnolia Hospital*, 92 F.3d 248 (5th Cir.1996), the plain-

tiff, a 53–year–old nurse, won a jury verdict in an age discrimination case. The employer presented evidence that the plaintiff's position was eliminated as part of a valid reduction in force ("RIF"). The plaintiff presented evidence that called into question the validity of the asserted reasons for the RIF. More importantly, the employer presented no evidence of legitimate, nondiscriminatory reasons for choosing the plaintiff's position for elimination in the RIF. The plaintiff presented evidence that the employer's chairman of the board told another employee that the employer "was planning lay off the 'older employees' " in the upcoming RIF. *Id.* at 253. In a later conversation, the same employee reminded the chairman that he had "said . . . [that] [t]hey're gonna lay off those old people." The chairman responded, "That's what they told me." *Id.* The plaintiff relied on the evidence of the chairman's statements to show age discrimination. The employer responded by pointing out that the chairman was not involved in deciding which positions would be eliminated, as the board had delegated that responsibility to the administrative staff. The court held that the chairman's statement was probative of age discrimination, finding that "[t]he jury could infer that [the] 'they' [in the chairman's statement] referred to the administrative staff", "which was accountable to the Board and to whom the Board had delegated responsibility for determining the positions to be eliminated, given that all evidence indicated that they were the persons directly involved in the elimination decision." *Id.* at 254–55. The plaintiff also presented evidence that the employer did not follow its stated policy of consulting the appropriate department head before deciding to eliminate her position and presented evidence disproving the employer's stated reason for later refusing to rehire the plaintiff. The Fifth Circuit upheld the district court's denial of the

tion, tends to support Methodist's position that its policy forbids a nurse to make the decision to insert a nasogastric tube without a doctor's order, obtained before the procedure.

25. Nurse Amy Goggins testified that she had inserted a Foley catheter without a doctor's order. However, she could not "recall writing a verbal order saying to insert one." (Tr. 587).

defendant's motion for judgment as a matter of law, finding that the plaintiff had "presented much more than a scintilla of evidence to support her age discrimination claim." *Id.* at 256.

Methodist's evidence of legitimate reasons for its action is much stronger than the employer's evidence was in *Woodhouse,* and Wallace's evidence is much weaker than the plaintiff's evidence in that case. Methodist presented undisputed evidence that Wallace violated written hospital policy. In *Woodhouse,* the plaintiff presented evidence that cast doubt on the validity of the employer's evidence that it undertook the RIF for valid reasons, and the employer produced no evidence that it used legitimate criteria in deciding which positions to eliminate in the RIF. The plaintiff in *Woodhouse* also presented evidence that the chairman of the board, although not the relevant decisionmaker, said that "they" had told him that older employees would be terminated as a result of the RIF. Although the "they" was not identified, the court held that the jury could infer that it referred to the principal decisionmakers. In this case, Wallace presented evidence that Schmitz, who was not the relevant decisionmaker, said Wallace had been discharged because of her pregnancies. Schmitz, unlike the chairman in *Woodhouse,* did not say that anyone had told her this; specifically, there was no suggestion that Hahus, the relevant decisionmaker, had told her. This statement was substantially less probative than the chairman's statement in *Woodhouse.* The plaintiff in *Woodhouse* offered other strongly probative evidence, besides the chairman's statement, that showed pretext. Wallace presents no similarly probative evidence of discrimination. The strongest evidence is Hahus's statement that Wallace needed to choose between work and family, a statement made ten months before Wallace was terminated and with no demonstrated connection to the termination decision.

The other similar, but distinguishable, case is *Haas v. ADVO Systems, Inc.,* 168 F.3d 732 (5th Cir.1999). In that case, the plaintiff alleged age discrimination, presenting evidence that a vice-president of the employer said, after interviewing the plaintiff, that his "only concerns about hiring [the plaintiff] were [his] age." *Id.* at 733. The vice-president did not make the final decision not to hire the plaintiff, but did make a recommendation. The employer asserted, as its legitimate nondiscriminatory reason for denying the plaintiff a position, that the vice-president "felt that the chemistry was better with [another candidate]." *Id.* The Fifth Circuit reversed the district court's grant of summary judgment, holding that the evidence of the vice-president's statement, although not "direct evidence" of discrimination, was sufficient to defeat summary judgment. *See id.* at 734.

Again, compared to *Haas,* Methodist's evidence is stronger than the employer's evidence, and Wallace's evidence is weaker than the plaintiff's. Methodist offered specific evidence that Wallace violated workplace policy; the employer in *Haas* merely said that the same vice-president who made a remark showing discriminatory animus felt that the "chemistry" was better with a different job candidate. The employer in *Haas* conceded that the vice-president who made the discriminatory remark offered a recommendation about the position. By contrast, Schmitz, although she offered some factual information to Hahus, did not participate in the decision to terminate Wallace, and Hahus's own arguably discriminatory statement was remote from the termination decision.

In this case, unlike *Woodhouse* and *Haas,* the plaintiff's "indirect" evidence that the employer's asserted reasons were a pretext for discrimination is insufficient to preclude judgment as a matter of law. When Wallace's evidence is placed next to Methodist's evidence, it is "so overwhelmed by contrary proof as to yield to a [judgment as a matter of law]." *Rhodes,* 75 F.3d at 993.

## V. Conclusion

The record as a whole does not present sufficient evidence to support the jury's

722

findings of discrimination. Wallace admitted performing a procedure without a doctor's authorization after making an entry in the patient's chart showing that such authorization had been given. Under Methodist's written policies, such violation was a ground for discharge, even of a long-term employee. Other than the discharge, Wallace alleged no discrimination in the terms and conditions of her employment. She received good evaluations, the hours and shifts she requested, scheduled raises, and the benefits available, including the maximum paid maternity leave that Hahus could obtain on Wallace's behalf. It was not until Wallace violated Methodist policies that she lost her job. The evidence that this occurred just as Wallace was about to begin a maternity leave; that Wallace believed Hahus resented her repeated pregnancies; and that Hahus and Schmitz made isolated remarks that may suggest discrimination, is simply insufficient, on this record, to sustain the jury's verdict. Methodist's motion for judgment as a matter of law is GRANTED.