**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-30435

CATHERINE BALTAZOR,

Plaintiff-Appellee,

versus

MORRIS HOLMES and
THE ORLEANS PARISH SCHOOL BOARD,                    Defendants-Appellants,

MAUDELLE DAVIS-CADE;
DR. J. BERENGER BRECHTEL;
GAIL MOORE GLAPION;
CAROLYN GREEN FORD and
CHERYL Q.W. CRAMER

Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

December 8, 1998

Before REYNALDO G. GARZA, DUHÉ, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Catherine Baltazor prevailed in a jury trial against her employer, the Orleans Parish School

Board and its superintendent, Dr. Morris Holmes, on her claims of race and sex discrimination in

violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§1981 and 1983. Our review

of the record leads us to conclude that as a matter of law Baltazor did not prove any violations of

Title VII by a preponderance of the evidence. Similarly, the record fails to support a cognizable violation of 42 U.S.C. §§1981 and 1983. Therefore, we find that the lower court should have entered judgment against Baltazor.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action was filed by Catherine Ann Baltazor, a white female who served as a clerical employee of the Orleans Parish School Board ("School Board") for 18 years until her resignation on May 3, 1996. Baltazor was sixty-one years old at the time of her resignation. Asserting causes of action under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§1981 and 1983, Baltazor alleged that she was the victim of "reverse" racial discrimination as well as gender discrimination.

Baltazor began her employment with the School Board in July 1977 as a clerk at a grade 4 pay level. Baltazor's employment continued and she progressed and was assigned as Secretary I in the Child Nutrition Department until 1991, when she was transferred to a position in the Employee Relations Department. Baltazor claims that upon her transfer in 1991, she was assigned the duties, but not awarded the title of the former Office Services Manager, Allen Webre. Webre, a white male, had recently retired from that position. Following her transfer in 1991, Baltazor continued to earn $20,500 per year and was classified at a grade 6 secretarial pay level. Baltazor alleges that prior to his retirement, Webre was earning $1486 bi-weekly at a grade 14 salary level in the office services manager position in 1990.[1] Baltazor maintains that following her "assumption" of the position, she

---

[1]It is important to note that Baltazor was classified as a grade 6 on the clerical grade scale and that Webre was classified as a grade 14 on the administrative and professional services scale. There is no direct correlation between the two scales. Clerical positions involve less responsibility and thus are classified on a different track as the administrative positions.

2

was kept at her secretarial pay and grade classification despite repeated requests for an increase in salary.

Holmes and the School Board argue that Baltazor was never given the position or all of the duties of office manager as she claims, but instead was transferred from the Child Nutrition Department to Employee Relations. They maintain that the decision to keep Baltazor classified as Secretary I at a grade 6 salary level was not uncommon. Holmes and the School Board explain that the move to Employee Relations was precipitated by Baltazor's October 1991 request for a transfer out of the Child Nutrition Department. At that time, Baltazor claimed that the black female assistant director for that department, Ms. Jackson, was "prejudiced" against her. Dr. Frank Fudesco, a white male associate superintendent who was head of several administrative units, promptly responded to Baltazor's complaints and transferred her to his department following her request. According to Baltazor, she served under Fudesco performing office manager-type job functions that included greater responsibility than was previously accorded to her at the Secretary I level. Baltazor claims that she persistently complained to Fudesco that: (1) unequal treatment was being inflicted upon her; (2) she was not being compensated for her position and duties; and (3) such failure was in violation of School Board policies.

Although Fudesco transferred Baltazor to his department and accorded her greater responsibilities, he did not take any action on Baltazor's request for a salary increase until his departure in July 1994. Ensuring that he would not be responsible for any action taken based on his suggestion, Fudesco mentioned toward the end of his June 10, 1994 exit memorandum that Baltazor had assumed a busy management position and recommended that she be reclassified to office manager. By this time, Dr. Morris Holmes, a black male, had become Superintendent of the School

3

Board. Fudesco's exit memorandum presented the first occasion for Holmes to become aware of her requests.

Baltazor renewed and redirected her complaints to Fudesco's successor, Associate Superintendent, James Henderson, a black male. On March 10, 1995, Baltazor sent her direct supervisor, Henderson, what Holmes and the School Board allege was her first written request to be reclassified as office manager and to be raised from a grade 6 classification to a grade 12. She also requested that the raise be made retroactive to October of 1991. In effect, the increase would cover a 44-month period. Unlike Fudesco, Henderson took immediate action and attempted to have Baltazor's position reclassified to a higher grade level. On March 13, 1995, Henderson sent a response and recommendation to Holmes endorsing, in part, Baltazor's request. Specifically, Henderson requested a reclassifaction from grade 6 to grade 10. Baltazor criticizes Henderson's recommendation because the proposed increase in grade level and salary was not commensurate with Webre's status or remuneration.[2]

Holmes forwarded the matter for consideration and further recommendation to the School Board's Director of Personnel, Ella Voelkel.[3] Voelkel is a white female who has served as the School Board's Director of Personnel since 1987.[4] Voelkel disagreed with Henderson's

---

[2] In a subsequent memorandum, Henderson retracted this recommendation.

[3] Voelkel's trial testimony reveals that Holmes asked her to analyze Henderson's memo and to provide Holmes with her own recommendation. Voelkel's response memo to Holmes is dated April 25, 1995.

[4] Holmes testified to the fact that he requested a recommendation from Voelkel and additional input from Voelkel and Henderson, in part, to refresh his memory of Baltazor and to be brought up to date on her situation. Holmes testified that once his memory of Baltazor was refreshed, he recalled having had some contact with her in the eleven months as superintendent. In their brief, Holmes and the School Board suggest that Holmes also sought counsel because of the magnitude of the requested

4

recommendation to Holmes, and in her memo to Holmes set forth her determinations that: (1) Baltazor had *not* been transferred to the position of office manager; (2) the previous office manager's duties had been reduced before his retirement; (3) if the office manager position were to be reestablished at a new salary level it would have to be "posted" for applications under the School Board's procedures; and (4) even if an office manager-type position were reestablished, the classification levels sought by Baltazor and recommended by Henderson were both excessive.[5] Holmes received Henderson's retraction and reasons following receipt of Voelkel's recommendation.[6] Relying on these two documents, Holmes denied the grade increase and reclassification.

Baltazor filed a claim with the Equal Employment Opportunity Commission ("EEOC") on May 18, 1995. Approximately four months after she filed her claim, Baltazor testified that she

_____

pay raise.

[5]Holmes testified:

Q. At the time that you received the memorandum, what did you do with it?
A. When I received the memorandum, and as I recall, I discussed this issue with Dr. Lloyd, my executive assistant, and Mrs. Voelkel, and it was saying to me that there was no rationale and there was no system to make this move. So, at this point in time, then this recommendation was acceptable to me, that I had no reason to believe that the Personnel Department had not looked at all of the issues, because any time that I asked my staff to do something of this nature, it means to do an analysis, to do all of the extraneous issues, take a look at the policies, take a look at the statutes and practices, and advise.
Q. Did you rely on this memorandum in coming to your final decision concerning this lady's request?
A. Yes, I did.

[6]Specifically, Henderson withdrew his recommendation stating,
The duties of the previous Office Manager far exceeded [Baltazor's] current assignment with the following supervisory responsibilities: Telephone Services, Mail Room, Duplications Services, Pool Typists, Maintenance (Janitorial) Services, Office Supplies for all Administrative Departments[.] Subsequently, the above responsibilities, with the exception of telephone and mail room activities, were disseminated to other departments.
Defendant's Exhibit 2.

5

received "a carefully construed memo" in which Henderson notified her that he had changed his mind on his decision to support, in part, her request for a reclassification. She resigned her position on May 3, 1996. Her position was not filled following her resignation. On July 18, 1996, the EEOC provided Baltazor with a right to sue letter under Title VII, prior to the completion of the School Board's investigation of her claim.

Baltazor filed this suit on January 16, 1996. She asserted separate causes of action under both Title VII of the Civil Rights Act and under the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983. Named as defendants were both the School Board and Holmes, as superintendent of the school system. Holmes and the School Board timely moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) at the close of Baltazor's case before the jury. The judge deferred his ruling and the jury awarded Baltazor compensatory damages in the amount of $200,000 against the School Board and punitive damages in the amount of $125,000 against Superintendent Holmes. The court entered judgment accordingly. Holmes and the School Board filed a renewed motion for judgment as a matter of law under Fed.R.Civ.P. 50(b). The court again deferred its ruling, but eventually denied both Rule 50 motions and set forth its reasons in a minute entry dated March 24, 1997. Holmes and the School Board timely appeal the jury verdict in Baltazor's favor and the denial of their Rule 50 motions.

## STANDARD OF REVIEW

We accord great deference to the jury's verdict when evaluating the sufficiency of the evidence. Under this standard, we view all of the evidence in the light most favorable to the verdict and reverse only if the evidence points "so strongly and overwhelmingly in favor of one party that the

6

court beleives that reasonable [jurors] could not arrive at any contrary conclusion." Boeing v. Shipman, 411 F.2d 365, 374 (5th cir. 1969)(en banc).

We review de novo the lower court 's ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a). Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1322-23 (5th Cir.), cert. denied, 513 U.S. 815, 115 S.Ct. 71, 130 L.Ed.2d 26 (1994). Again, we view all evidence and reasonable inferences in favor of the non-movant. If reasonable persons could differ in their interpretation of the evidence, the motion should be denied. Only when the facts and the reasonable inferences are such that a reasonable juror could not reach a contrary verdict may the district court properly grant a motion for judgment as a matter of law. Texas Farm Bureau v. United States, 53 F.3d 120, 123 (5th Cir. 1995).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that a complainant, like Baltazor, in a Title VII trial carries the initial burden of establishing a prima facie case of racial discrimination. Id. at 802, 93 S.Ct. at 1824; see also, Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996)("To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a *prima facie* case of discrimination.") However, as this court held in Harrington v. Harris, 118 F.3d 359 (5th Cir. 1997), the elements of a *prima facie* case can be inapposite:

> [W]hen a case has been tried on the merits, a reviewing appellate court need not address the sufficiency of plaintiff's *prima facie* case, and may instead proceed directly to the ultimate questions of whether plaintiff has produced sufficient evidence for a jury to find that discrimination occurred. In other words, the focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff.

Id. at 367 (internal quotations and citations omitted).

7

We conduct a traditional sufficiency of the evidence analysis to determine whether reasonable jurors could find discriminatory treatment. Travis v. Board of Regents of the University of Texas, 122 F.3d 259, 263 (5th Cir. 1997). We are mindful that a Title VII plaintiff must prove that the employer's purported reasons for taking an adverse employment action are pretextual and that the employer engaged in illegal discrimination. Boeing, 411 F.2d at 374. Thus, in order to prove race or gender based discrimination, the complainant must present evidence that gender or race were determinative in the employment decision. However, subtle distinctions exist between an inference of pretext and proof of actual discrimination. Given these distinctions, we have concluded that "it is possible for a plaintiff's evidence to permit a tenuous inference of pretext and, by extension, discrimination, and yet for the evidence to be insufficient as a matter of law to support a finding of discrimination." Travis, 122 F.3d at 263 (citing Walton v. Bisco Industries, 119 F.3d 368, 372 (5th Cir. 1997)).

## Discussion

Our analysis of the issues in this case requires us to evaluate first Baltazor's claim that she was denied a reclassification and increase in salary based on her race or gender. Next we consider whether Baltazor's Sections 1981 and 1983 claims should have gone to the jury. Third, we turn our attention to the award of compensatory damages. Our discussion ends with an assessment of the Title VII case against the Superintendent, Dr. Morris Holmes.

A.

This case centers on whether the School Board should have increased Baltazor's compensation since she assumed responsibilities beyond her job description; yet, it is masquerading as a Title VII case. Given the legitimate controversy over proper compensation and application of

the procedures of reclassifying Baltazor's position, the jury could have reasonably concluded that Baltazor was underpaid and overworked. The central question, however, is not whether appellants should have paid Baltazor more money but whether the evidence can support a finding that the real reason for the School Board's decision not to raise her compensation bespeaks race or gender discrimination. Our review of the record leads us to conclude that there is no evidence which could lead a reasonable juror to conclude that the appellants discriminated against Baltazor on the basis of either her race or gender.[7]

The trial court declined to grant appellants motion for judgment as a matter of law because it determined that "the jury heard credible evidence of the job responsibilities competently assumed by plaintiff, the position perceived by others, her request for reclassification, the racial hostility extant within the school administration and the school board's proffered reasons for refusing to take action on the matter." Baltazor v. Holmes, Civil Action No.: 96-150, Section "K" (Minute Entry March 24, 1997). Record 288-89. Baltazor echoes these same conclusions in her pleadings before this court. These reasons are unpersuasive.

First, the job responsibilities "competently" assumed by Baltazor are not the same responsibilities required of Webre. Baltazor failed to prove that she was in a position or performing duties equal to Webre's. Voelkel's trial testimony demonstrates that Webre's salary and grade levels were increased and his position upgraded several times during his tenure at the School Board. Such upgrades were due, in part, to Webre's assumption of new duties and responsibilities. One of Webre's most significant duties-supervision of the Print Shop-was assigned to him in 1982. At that

---

[7]Neither the jury instructions nor the verdict form offers a distinction between a finding of race discrimination or gender discrimination. Consequently, the jury's verdict is ambiguous on the issue of whether it found race discrimination, gender discrimination or both. Without such a distinction, our course is made more difficult.

time, Webre was raised from a grade 12 to a grade 14. Voelkel testified that prior to Webre's retirement in 1990, many of Webre's most significant job duties and responsibilities had been phased out or reassigned to other employees.[8] Consequently, Baltazor could not have assumed responsibility for all of the same responsibilities that Webre performed. Accordingly, the School Board was correct to decline compensation on the same level as Webre.[9]

While others may have perceived that Baltazor assumed the position of Office Manager, there is no doubt that her immediate supervisor, Fudesco, and the supervisor of personnel understood that she was not the Office Manager. Dr. Fudesco conceded as much in his exit memorandum imploring the School Board to re-establish the position. The position had been abolished and its responsibilities reassigned to others. Similarly, Voelkel repeatedly testified that she did not believe that Baltazor was performing the same duties as Webre. No employer can discriminate for failing to fill a position which no longer exists unless the employer eliminated the position as a means of discrimination. See e.g., Mills v. Intern. Broth. of Teamsters, et al., 634 F.2d 282 (5th cir. 1981)(position must be available). Despite how others perceived Baltazor's duties, the responsibilities inherent to the position were assigned to others and the position eliminated upon Webre's retirement. Baltazor did

_____

[8]Specifically, Voelkel's testimony indicates that Webre's management of the Print Shop was reassigned to another employee, Ms. Johnson, in 1984; his management of the Mail Room went to Dr. Fudesco's department and was reassigned to Baltazor, among others; and that Webre's duty of ordering supplies was decentralized following his retirement so that each department handled its own supply needs. Additionally, Voelkel testified that Baltazor did, in fact, assume certain tasks that had formerly been done by Webre including telephone services.

[9]The previous existence of the Office Manager position does not mandate its continued existence, especially when the costs of maintaining such a position outweighs the benefit of having multiple employees assume the responsibilities.

not contend nor does the record support any indication that the position was eliminated as a means of precluding Baltazor's advancement.

Baltazor's requests for reclassification did not comply with board policy and there is no indication that race or gender discrimination formed the basis of the School Board's decision to deny the request. The record indicates that Baltazor's request for reclassification did not follow School Board procedures. Voelkel testified that there are two ways in which a position within the School Board is reclassified. First, the Superintendent may authorize an "all-call" request for reclassifications from all department heads. Those department heads may recommend positions within their departments for reclassification. Then, a committee is formed to review these requests and make recommendations to the superintendent. The superintendent then approves or disapproves the recommendations. For any recommendations approved, the superintendent then makes a recommendation to the School Board.

Second, a department head seeks authorization from the superintendent for a position reclassification. If the authorization is obtained, the budget committee must then approve the reclassification and the position is then announced for general applications. Voelkel testified that there is no reclassification procedure by which an individual can challenge her own salary in the manner that Baltazor attempted. Voelkel's recommendation against Baltazor's reclassification was, in part, motivated by these procedures and her belief that neither Baltazor or other employees be reclassified outside of a comprehensive scheme. In addition, Voelkel testified that African American employees had been denied reclassification during Dr. Holmes's tenure as superintendent.

Again, it is important to note that neither race nor gender played a role in this determination. Dr. Fudesco, a white male, failed to make the recommendation during his tenure as Baltazor's

11

supervisor. Instead he offered unsubstantiated assurances that Baltazor would be reclassified. On the other hand, his successor, Henderson, a black male made an immediate effort to secure a reclassification although below the level Baltazor requested. The exit memorandum and Henderson's requests were reviewed by Voelkel, a white woman, who offered sound reasons for her recommendation that the superintendent decline the reclassification. Holmes adopted the recommendation of his personnel specialist. Based on these facts, no reasonable juror could conclude that the reason for the denial was related to race or gender.

Baltazor's attempts to obscure the weakness of her case by emphasizing that the adverse personnel decision she complains of occurred in a climate of racial hostility. However, nothing in the record connects "the racial hostility in the school administration" to Baltazor's claim of racial discrimination. Baltazor endeavored to prove by direct and circumstantial testimony that she was subject to racial animus on the part of the school board. Baltazor asserts that the School Board's constant refrain "positions are reclassified, not people" is evidence of pretext for its underlying discriminatory animus. The record is wholly devoid of any indication that the policy for reclassifying positions operates to the detriment of whites or women. Persons from different races and genders were treated the same under the policy as articulated by Voelkel.

Despite objections by Holmes and the School Board, Baltazor presented two former School Board employees, Boyd and Ducote, as witnesses who testified that Holmes downgraded their positions and negatively affected their salaries because they are white. Baltazor's employment was completely unrelated to either of these two persons. Boyd initially performed the duties of Director of Security and was later reassigned to Director of Investigations. The School Board employed Ducote as the Director of Facility Planning. He also assumed Associate Superintendent

12

Responsibilities. The record is improperly infected with their accounts of racial hostility and like a contagious disease it was spread to include Baltazor.[10]

However these accounts may portray similarities in the manner Holmes treated Boyd and Ducote, they do not prove any relationship between the perceived animus and the decision not to reclassify Baltazor. The probative value of their testimony is highly questionable. Indeed, the record is devoid of any direct contact between Baltazor and Holmes regarding her request for a promotion. Instead, it shows that she dealt only with Fudesco and Henderson. The absence of either a direct or credible circumstantial nexus between Holmes and Baltazor precludes any finding of discriminatory intent. Neither the general environment at the School Board, nor the specific conduct of Holmes regarding other employees support the inference that the denial of Baltazor's request for a pay increase was due to her race or gender.

Finally, the proffered reasons for declining the reclassification were wholly consistent with School Board practice and policy. In summary, Baltazor's assumed duties did not merit the desired reclassification given fundamental changes in the position prior to Webre's departure. In fact, the office manager position no longer existed. Voelkel who acted upon the request for reclassification followed the policy and procedure for reclassification. Nothing in that policy advances race or gender discrimination in the work place. Even if the School Board chose to reactivate the position, the record indicates that Baltazor was not academically qualified to fill the grade 12 position.

---

[10]We express no opinion on the merits of any action pending between these parties, the School Board, and Dr. Holmes.

13

While the jury may have believed that Baltazor should have received greater compensation for the work she performed, the evidence does not support a finding that she was discriminated against on the basis of her race or gender.

B.

We turn next to the sufficiency of the evidence regarding Baltazor's §§ 1981 and 1983 claims against both Superintendent Holmes and the School Board. Once again, we must review the ultimate question whether Baltazor produced sufficient evidence for a jury to find that discrimination occurred. Walther v. Lone Star Gas Co., 952 F.2d 119, 122 (5th Cir. 1992). This determination is made with an appreciation for the elements of a *prima facie* case. With regard to claims of discrimination in violation os § 1981 discrimination, we review the sufficiency of the evidence to determine whether it supports a finding that the defendant discriminated against the plaintiff. See, LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 n. 2 (5th Cir. 1996). Under §1981a, punitive damages may be awarded against an employer proved to have, "engaged in discriminatory practice or discriminatory practices with malice or reckless disregard to the federally protected rights of an aggrieved individual." 42 U.S.C. §1981a(b)(1).

In the § 1983 liability, we review the sufficiency of the evidence to determine whether it supports a verdict finding that a municipality or local government entity acted pursuant to an official municipal policy that caused a constitutional tort. See, Monell v. Dep't. of Social Services of the City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)(articulating the elements of a *prima facie* Section 1983 claim). The Monell Court was explicit in its holding that §1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis

14

of the existence of an employer-employee relationship with a tortfeasor." Id. at 692, 98 S.Ct. at 2036.

Monell held that policy may be made by a local governments' lawmakers or by those whose edicts or acts may be fairly said to represent official policy. Id. at 694. Baltazor bases her sections 1981 and 1983 claim against the School Board on the actions of Holmes. We are aware that it is rare for a plaintiff to be in a position to provide direct evidence of discriminatory intent. LaPierre, 86 F.3d at 449. Thus, a plaintiff will be allowed to prove intentional discrimination through circumstantial evidence and, specifically, evidence that the defendant's articulated nondiscriminatory rationale was pretextual. Harrington v. Harris, 108 F.3d 598, 606 (5th Cir. 1997) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 251-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

Nevertheless, Baltazor did not produce sufficient proof to support her §§ 1981 and 1983 claims. The record does not support a finding that Holmes acted with malice or reckless disregard of her federal rights to entitle her to the punitive damages awarded by the jury. Again, we underscore the fact that Baltazor offers no proof of direct contact between herself and Holmes, or of any indirect statements or actions against her by Holmes. Even she acknowledged that the perceived race and gender discrimination problems existed before Holmes became the superintendent.[11] Holmes received the request for a reclassification some eleven months after he became the superintendent and referred

---

[11] A subjective belief alone is insufficient to create a jury question. Travis, 122 F.3d at 266 (citing Armendariz v. Pinkerton, 58 F,3d 144, 153 (5th Cir. 1995), cert. denied, --- U.S. ---, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996)).

the matter to Voelkel who advised him that there was no basis for the action. Nothing in the record diminishes the validity of the Voelkel's recommendation and by extension, Holmes' decision to act on that recommendation.

Moreover, we are hard-pressed to find that Holmes articulated nondiscriminatory rationale was pretextual even when considering the circumstantial evidence presented in this case. The record indicates that Baltazor, in fact, did not hold the same qualifications as those who were earning the grade 12 salary. Neither in her brief, nor at oral argument did her attorneys demonstrate that she had satisfactory qualifications for the job. We likewise reject the circumstantial evidence based on the testimony of Boyd and Ducote because of the absence of any nexus between the nature of their contact with Holmes and the decision not to act on Baltazor's request.

In support of her § 1983 claim, Baltazor notes that the Supreme Court as well as the Fifth Circuit have held that liability may be found against a local government entity for its "official policies"—which are not limited to statements, ordinances, regulations, or decisions that are officially adopted by a designated policy-making authority, but can also include persistent or widespread practices which are so common as to constitute a local custom." Webster v. Houston, 735 F.2d 838 (5th Cir. 1984) (en banc). Even the Monell Court recognized that a practice may be so persistent that it constitutes a custom even though it has not been formally approved by the body's official decision makers. Monell, 436 U.S. at 691.

We find that Baltazor's emphasis on Monell merely underscores the insufficiency of the evidence she brought. Though Baltazor, through her witnesses Boyd and Ducote, put forth evidence that racially insensitive remarks were made by Holmes to other School Board employees, she did not meet her burden of proving that such remarks or attitudes had so pervaded the workplace as to make

16

them a "custom" for purposes of § 1983 litigation. Our review of the record indicates that only Boyd and Ducote testified to the general discriminatory environment at the School Board. While some of Baltazor's other witnesses may have testified to the fact that Baltazor was performing at a higher level than she was being recognized or that she deserved a promotion, they did not testify to a pattern or policy of the School Board to which Holmes' treatment of Baltazor can be attributed.

## C.

Having determined that the evidence was not sufficient to support the jury's verdict on the merits of the case, we need not address the issue of whether the award of punitive damages were excessive. We render a take-nothing judgment in favor of the appellants.

## D.

Similarly, we find no reason to address the issue of whether the Title VII claim proceeded against Holmes in his personal capacity. Again, the evidence simply does not support the jury's verdict in any respect.

## CONCLUSION

The trial court's judgment based on the jury verdict is REVERSED, and a take-nothing judgment is RENDERED in favor of Holmes and the School Board.

17