**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 99-20721
_____

INSURANCE COMPANY OF NORTH AMERICA, Surety for Maitland
Brothers Company and as Assignee and Equitable suborgee of
the claims of Maitland Brothers Company; MAITLAND BROTHERS
CO, by its Trustee in Bankruptcy Maryleen Thomas,

                          Plaintiffs - Counter Defendants  -
                          Appellants - Cross-Appellees,

                    VERSUS

        ABERDEEN INSURANCE SERVICES, INC; ET AL,

                          Defendants,

        ABERDEEN INSURANCE SERVICES, Inc; ST ANDREWS
                INSURANCE SERVICES, INC.,

                          Defendants-Cross Defendants-
                          Appellees-Cross-Appellees,

                    VERSUS

    INDEMNITY MARINE ASSURANCE CO LTD; COMPAGNIE D'ASSURANCES
    MARITIMES AERIENNES ET TERRESTRES; ASSURANCES GENERALES DE
    FRANCE IART; SPHERE DRAKE INSURANCE PLC; COMMERCIAL UNION
 ASSURANCE COMPANY; THE TOKIO MARINE & FIRE INSURANCE CO (UK)
  LTD; THE YORKSHIRE INSURANCE CO LTD; NORTHERN ASSURANCE CO
 LTD; TERRA NOVA INSURANCE CO; ASSICURAZIONI GENERALI; ATLAS
ASSURANCE CO LTD; THE SCOTTISH LION INSURANCE CO LTD; FOLKSAM
INTERNATIONAL INSURANCE CO (UK) LTD; AEGON INSURANCE COMPANY
(UK) LIMITED; SKANDIA MARINE INSURANCE COMPANY (UK) LIMITED,

                          Defendants - Counter Claimants -
                          Appellees - Cross-Appellants.

                _____

        Appeals from the United States District Court
         for the Southern District of Texas, Houston
                _____
                    June 25, 2001

Before JOLLY, MAGILL[*] and BENAVIDES, Circuit Judges.

MAGILL, Circuit Judge:

In January 1997, Appellants Insurance Company of North America ("INA") and Maitland Brothers Company ("Maitland") brought suit against Aberdeen Insurance Services, Inc. ("Aberdeen") and various London Underwriters (the "Underwriters") in federal district court, seeking coverage under an insurance policy issued by Aberdeen to Offshore Diving and Salvage, Inc. ("Offshore"), a Maitland subcontractor. The Underwriters filed a counterclaim, alleging Appellants brought their suit in bad faith. After an eight-day trial, a jury entered a special verdict, deciding in favor of INA and Maitland. However, the district court concluded that there was insufficient evidence to support the jury's findings as to some of the questions that formed the special verdict. Therefore, the court entered judgment as a matter of law under which INA and Maitland received no damages, but denied the Underwriters' motion for judgment as a matter of law on their counterclaim. Maitland and INA appeal the district court's partial reversal of the jury's findings and judgment in favor of the Underwriters. The Underwriters cross-appeal the district court's denial of their motion for judgment as a matter of law on their counterclaim. Because we conclude

---

[*]Circuit Judge of the Eighth Circuit, sitting by designation.

that the district court erred insofar as it overruled the jury's verdict, we reverse the district court's partial grant of judgment as a matter of law for the Underwriters and affirm the district court's denial of the Underwriters' motion for judgment as a matter of law on their counterclaim.

## I.

### A.    The DOE Contract

In November 1993, the United States Department of Energy (the "DOE") contracted with Maitland to construct a pipeline from the Strategic Petroleum Reserve at Bryan Mound, Texas to the Gulf of Mexico.  As part of the contract between the DOE and Maitland (the "DOE Contract"), the DOE required Maitland to maintain comprehensive general liability and third party property damage insurance, naming the United States as an additional insured.  In addition, the DOE required that its Contracting Officer receive thirty days advance written notice, by mail, of any changes in, or cancellation of, such insurance policies.  The DOE Contract also contained the Federal Acquisition Regulations (the "FAR") applicable to the project.  One of these FAR, titled "Insurance - Work on a Government Installation" ("FAR 47"), required Maitland to maintain certain types of insurance, certify that the required insurance had been obtained, and provide at least thirty days notice of cancellation.  Additionally, FAR 47 stated: "The Contractor shall insert the substance of this clause, including

3

this paragraph (c), in subcontracts under this contract that require work on a Government installation."  The DOE Contract also provided that Maitland was fully responsible for all acts and omissions of its subcontractors.  Appellant INA was the surety under the performance and payment bonds issued to Maitland pursuant to the DOE Contract's requirements.

**B.    The Offshore Subcontract**

On November 16, 1994, Maitland entered into a contract (the "Subcontract") with Offshore, under which Offshore was to provide diving services in connection with Maitland's construction of the pipeline.  Prior to signing the Subcontract, Maitland's comptroller, Peter Comly, discussed insurance requirements with Offshore and spoke to Offshore's insurer, Aberdeen.  After the parties signed the Subcontract, Aberdeen sent Maitland a certificate of insurance confirming that Maitland was an additional insured on Offshore's policies, that the required insurance was in effect, and that Maitland would be provided thirty days notice prior to cancellation of Offshore's insurance. Paragraph One of the Subcontract stated: "[t]he Sub-contractor assumes with respect to the General contractor all of the obligations which the General contractor owes to the owner under the contract and all of the contract documents forming part of the contract for the DOE Contract . . . ."

## C. Offshore's Insurance

Aberdeen was the domestic broker for Offshore's comprehensive general liability and property damage insurance policy (the "Cover Note"). The Underwriters subscribed to the security on the Cover Note. Offshore paid the bulk of the Cover Note through a premium financing agreement with Premium Finance Specialists, Inc. ("PFS") that required Offshore to pay PFS in monthly installments. Offshore failed to make its scheduled premium payments to PFS, so, on January 3, 1995, PFS issued Offshore a Note of Intent to Cancel. The Cover Note was canceled effective January 15, 1995. Maitland received no notice of the cancellation.

## D. The Accident

On March 2, 1995, Offshore's anchors struck a portion of the pipeline, breaking it into two sections.[1] On March 6, Peter Comly telephoned Aberdeen to inform it of the pipe break. He explained that Maitland was responsible for the repairs and asked Aberdeen to investigate. On March 7, Aberdeen sent a notice of cancellation to Maitland, indicating that the Cover Note had been cancelled effective January 15, 1995 due to Offshore's failure to pay its premiums. The Underwriters denied coverage of the loss

---

[1]An earlier, unrelated break had taken place on February 6, 1995.

in an April 3, 1995 letter stating that the accident "was outside the policy period and therefore of no concern to Underwriters."

**E.    Repair of the Pipeline**

After receiving the Underwriters' April 3 letter, Maitland contacted INA, its insurer, for financial assistance in repairing the pipeline.  The DOE informed Maitland that under the DOE Contract, Maitland was responsible for its subcontractors' performance and thus was responsible for the delays caused by the March 2 accident.  Maitland devised a repair plan, which the DOE approved.  Maitland attempted repairs until mid-July, when INA became dissatisfied with Maitland's repair efforts and removed it from the job.  INA hired J. Ray McDermott  ("McDermott") to complete the repairs.  On July 30, 1995, McDermott struck the pipeline, causing additional damage.  McDermott billed approximately $2.2 million for its work, of which INA paid $700,000 for work prior to the July 30 pipe break.  Subsequently, INA, McDermott, and McDermott's insurer entered into a negotiated settlement (the "McDermott Settlement"), in which they apportioned the damage caused by Offshore's March 2 break and McDermott's July 30 break, concluding that $769,000 of McDermott's work was related solely to repairing Offshore's break.

When the contract between Maitland and the DOE was not timely completed, the DOE was entitled under the contract to

6

assess liquidated damages of $5400 per day against Maitland. Following completion of the project, INA and the DOE entered into a settlement agreement under which the DOE assessed liquidated damages of $615,000 (the "DOE Settlement").

## F.    The Proceedings Below

In January 1997, INA and Maitland sued Aberdeen and the Underwriters, alleging that: (1) Maitland was an additional insured entitled to coverage under Offshore's Cover Note; (2) the Cover Note required that the Underwriters give Maitland thirty days notice prior to cancellation; and (3) the January 15, 1995 cancellation of the Cover Note was ineffective as to Maitland because the Underwriters failed to provide the required notice. The Underwriters counterclaimed, alleging that Appellants' suit was baseless and brought in bad faith.

Following an eight-day trial, the jury found for INA and Maitland on their claims against the Underwriters, concluding that: (1) Maitland and Offshore agreed in the Subcontract that Maitland would be an additional insured under the Cover Note; (2) Maitland and Offshore agreed in the Subcontract that thirty days notice of cancellation would be given to Maitland before cancellation would be effective as to Maitland; (3) Maitland was obligated to insert the substance of Clause 47 of the DOE Contract (containing FAR 47) into the Subcontract; (4) the Subcontract inserted the substance of Clause 47 of the DOE

7

Contract; (5) the Underwriters agreed in the Cover Note to provide thirty days advance written notice of cancellation to Maitland; (6) the Underwriters failed to give thirty days written notice to Maitland prior to cancellation of the Cover Note; (7) Maitland incurred a loss that was covered and payable under the Cover Note; (8) Maitland faced potential liability to the DOE for the damages caused by Offshore to the pipeline, and Appellees entered into a reasonable, prudent, good-faith settlement with the DOE to resolve that potential liability; (9) Appellants incurred damages in the amount of $3,827,798.76 in settling with the DOE; (10) Maitland presented Aberdeen, the Underwriters' actual or apparent agent, with a claim for damages arising out of the March 2, 1995 pipeline break; and (11) the Underwriters denied Maitland's claim. The jury also found for Maitland and INA on the Underwriters' counterclaim, concluding that Appellants did not bring suit in bad faith or for purposes of harassment.

On June 30, 1999, the district court entered an order finding that there was sufficient evidence to support the jury's conclusions that: (1) Maitland and Offshore agreed in the Subcontract that Maitland would be an additional insured under the Cover Note; (2) Maitland and Offshore agreed in the Subcontract that thirty days notice of cancellation would be given to Maitland before cancellation would be effective as to Maitland; (3) the Underwriters failed to give thirty days written notice to Maitland prior to cancellation of the Cover Note; and

8

(4) Maitland incurred a loss that was covered and payable under the Cover Note. However, the court also concluded that there was insufficient evidence to support the jury's findings that: (1) the Subcontract inserted the substance of Clause 47 of the DOE Contract (which contained FAR 47); (2) the Underwriters agreed in the Cover Note to provide thirty days advance written notice of cancellation to Maitland; (3) Maitland faced potential liability to the DOE for the damages caused by Offshore to the pipeline; (4) Appellants incurred damages in the amount of $3,827,798.76 in settling with the DOE; (5) Maitland presented Aberdeen, the Underwriters' actual or apparent agent, with a claim for damages arising out of the March 2, 1995 pipeline break; and (6) the Underwriters denied the claim. The district court went on to find as a matter of law that the Subcontract did not incorporate by reference the substance of Clause 47 of the DOE Contract. Finally, the court found that the Cover Note did not provide coverage for liquidated damages. Based on these findings, the court entered judgment that INA and Maitland receive no damages from the Underwriters, and denied as moot the Underwriters' motion for judgment as a matter of law on their counterclaim.

INA and Maitland appeal from the judgment of the district court partially reversing the jury's findings. The Underwriters appeal the district court's denial of their motion for judgment as a matter of law on their counterclaim, as well as the court's upholding of the jury's finding that Maitland suffered a loss

9

that was covered by Offshore's Cover Note.

## II.

We review the district court's ruling on a motion for judgment as a matter of law de novo, viewing all evidence in the light most favorable to the verdict. Baltazor v. Holmes, 162 F.3d 368, 373 (5th Cir. 1998). All evidence and reasonable inferences are viewed in favor of the nonmoving party. Id. If the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict, the court properly granted the motion. Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 950-51 (5th Cir. 1994). If there is substantial evidence – that is, evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion – then the court should have denied the motion. Id. at 951.

## III.

### A.  Notice of Cancellation

Appellants contend that the Underwriters were required to provide Maitland with thirty days notice prior to the cancellation of Offshore's Cover Note, and that the failure to do so renders the cancellation ineffective as to Maitland. The district court rejected the findings of the jury, which were consistent with Appellants' contention. As neither the Subcontract nor the Cover Note contains an express requirement

10

that the Underwriters provide Maitland with advance notice of cancellation, Appellants advance several theories in support of their argument that such notice was required.

First, Appellants assert that Article 24.17 of the Texas Insurance Code imposed a statutory notice obligation upon the Underwriters.[2]  Tex. Ins. Code Art. 24.17 (2001).  Article 24.17 requires a premium finance company to issue a written notice of intent to cancel for payment default to the insured prior to mailing a notice of cancellation to the insurer.  Id. Art. 24.17(c).  Specifically,  Article 24.17 provides, in pertinent part: "All . . . contractual restrictions providing that the insurance contract may not be cancelled unless notice is given to a . . . third party apply where cancellation is effected under this section."  Id. Art. 24.17(e).

Article 24.17(e) offers no support for Appellants' claim that the Underwriters were obligated to provide advance notice of cancellation.  It merely provides that any contractual provision

_____

[2]The Underwriters argue that Appellants failed to raise this issue before the district court and thus should be foreclosed from raising it on appeal.  We note that Appellants neither requested a jury instruction based on Article 24.17 nor objected to the lack of such an instruction.  Furthermore, Appellants also failed to raise the issue in a motion for directed verdict or to argue that Article 24.17 should preclude the district court from granting Underwriters' motion for judgment as a matter of law. However, Appellants did present testimony and argument at trial regarding the application of Article 24.17, and the court admitted the text of the statute into evidence for the jury's consideration.  Accordingly, although Appellants may have waived this issue, we assume arguendo that it was raised sufficiently before the district court.

requiring notice of cancellation to a third party remains in full force and effect notwithstanding the additional notice requirements imposed upon premium finance companies by Article 24.17. Thus, if the Underwriters were under a contractual obligation to provide notice to Appellants prior to cancelling Offshore's Cover Note, Article 24.17(e) simply would confirm that this obligation exists even where the cancellation occurs pursuant to a premium finance company's termination for nonpayment of premiums. Conversely, if the Underwriters had no such contractual notice obligation, Article 24.17 would not create an independent notice requirement. Accordingly, Appellants' argument that the Underwriters had an independent statutory obligation to provide Maitland notice prior to cancelling Offshore's policy fails.

Appellants next argue that the Underwriters' duty to provide advance notice of cancellation was created by the incorporation language in Paragraph 1 of the Subcontract between Maitland and Offshore, which states: "[t]he Sub-contractor assumes with respect to the General Contractor all of the obligations which the General contractor owes to the owner under the [DOE Contract]." Appellants argue that this clause incorporated the provisions of the DOE Contract requiring thirty-day notice of cancellation into the Subcontract by reference. Appellants identify two provisions in the DOE Contract that arguably were incorporated into the Subcontract, thereby imposing a duty to

12

provide Maitland with notice of cancellation: (1) FAR 47,

entitled "Insurance - Work on a Government Installation"; and (2)

Section 16.0 of the DOE contract, entitled "Insurance."

FAR 47 inserts 48 C.F.R. § 52.228-5 into the DOE Contract

verbatim, stating, in pertinent part:

> (a) The Contractor shall . . . maintain during the entire performance of this contract, at least the kinds and minimum amounts of insurance required in the schedule or elsewhere in the contract.
> (b) . . . The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective . . . until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer, whichever period is longer.
> (c) The Contractor shall insert the substance of this clause, including this paragraph (c), in subcontracts under this contract that require work on a Government installation. . . .

Despite their failure to insert the text of FAR 47 into the

Subcontract, Appellants argue that the incorporation language in

Paragraph 1 inserted the substance of FAR 47, including the

thirty-day notice requirement.  Generally, Federal Acquisition

Regulations "should be incorporated by reference to the maximum

practical extent." 48 C.F.R. § 52.102-1(a).  However, it is clear

that unlike other Federal Acquisition Regulations, FAR 47 must be

"inserted" into certain contracts.  See id. § 28.310(a) ("The

contracting officer shall **insert the clause** at 52.228-5,

Insurance - Work on a Government Installation, in solicitations

and contracts when a fixed-price contract is contemplated, the

13

contract amount is expected to exceed the simplified acquisition threshold, and the contract will require work on a Government installation.") (emphasis added).  This specific requirement supersedes the general principle that Federal Acquisition Regulations may be incorporated by reference, and is at odds with Appellants' argument that FAR 47 may be inserted automatically into a contract via a general incorporation clause.[3] Furthermore, FAR 47 itself contains the independent requirement that "[t]he Contractor shall insert the substance of this clause . . . in subcontracts under this contract."  Id. § 52.228-5(c). The plain meaning of these provisions contradicts Appellants' argument that FAR 47 was incorporated into the Subcontract by reference.  Therefore, the district court correctly concluded that the Subcontract did not incorporate FAR 47 as a matter of law, and thus FAR 47 created no obligation for the Underwriters to provide Maitland notice before cancelling Offshore's insurance.

However, we agree with Appellants' alternative argument that Section 16 of the DOE Contract imposed a duty upon the Underwriters to provide notice of cancellation.  Section 16 states, in pertinent part:

---

[3]We also note that the DOE Contract itself contains the entire text of FAR 47, rather than incorporating it by reference, as Appellants contend is permissible.

14

> The Contractor shall maintain, at his expense, Workmen's Compensation, Liability Insurance, and all other insurance as provided below. Provisions shall be made for thirty (30) days advance written notice by mail to the Contracting Officer of any changes in or cancellation of any such insurance.

Appellants argue that this provision, which obligated Maitland to provide for written notice to the DOE, in combination with Paragraph 1 of the Subcontract, obligated Offshore to provide for written notice to Maitland. The Underwriters respond that Offshore was not aware of the notice requirement when it signed the Subcontract, so no such duty existed. Alternatively, the Underwriters claim that even if Section 16 obligated Offshore to provide for advance notice, it imposed no duty upon the insurer to provide notice of cancellation.

It is well settled that where a contract is incorporated by reference into a subcontract, the subcontractor is conclusively presumed to undertake the work subject to the conditions and limitations of the prime contract. Hartwell v. Fridner, 217 S.W. 231, 235 (Tex. Civ. App. 1919). Furthermore, "[e]ach contracting party owes a duty to the other party to read and know the contents of the contract before each one signs it." Kaplan v. Bernard Lumber Co., 710 S.W.2d 737, 740 (Tex. App. 1986). Accordingly, when Offshore entered into the Subcontract, in which the first paragraph contained a clause incorporating by reference the terms of the DOE Contract, it is presumed to have knowingly assumed duties under the DOE Contract. Therefore, we reject the

15

Underwriters' argument that Offshore had no duty to provide for written notice to Maitland simply because Offshore allegedly was unaware of its duties under the DOE Contract.

The Underwriters' second contention, that Section 16 imposes no duty upon the insurer, is also flawed. Section 16 of the DOE Contract imposed a duty upon Maitland to provide for notice of cancellation, and Paragraph 1 of the Subcontract transferred that duty to Offshore. The Underwriters' witnesses testified, and the district court found, that the Cover Note's notice provision automatically required the Underwriters to provide notice to third parties if Offshore entered into a written contract requiring such notice. Thus, because the Subcontract incorporated Section 16 of the DOE Contract by reference, causing Offshore to assume the duty of making provisions for notice of cancellation to Maitland, the Cover Note's notice provisions automatically required the Underwriters to provide notice to Maitland.

We conclude that the district court erroneously relied on Maitland's failure to insert the substance of FAR 47 into the Subcontract in holding that the Underwriters had no duty to provide notice of cancellation. Instead, we hold that Section 16 of the DOE Contract provided an independent basis for imposing upon Offshore, and thus upon the Underwriters through the Cover Note, the duty to provide notice to Maitland. Accordingly, because the Subcontract incorporated Section 16 of the DOE

16

Contract by reference, the Underwriters had a duty to provide Maitland with thirty days notice prior to cancellation of Offshore's policy. We therefore reinstate the jury's finding that the Underwriters had such a duty.

## B.    Coverage

Since the Underwriters' failure to provide the required notice to Maitland before cancelling Offshore's Cover Note renders the cancellation ineffective as to Maitland, we next must address whether Offshore's Cover Note covered Maitland's loss, and whether the Underwriters thus were obligated to compensate Appellants for the loss. The district court upheld the jury's finding that the Cover Note provided coverage for Maitland's loss. However, the court rejected the jury's determination that Maitland faced potential liability to the DOE and entered into a settlement to resolve that liability.

Although the district court treated the issues of coverage and potential liability separately, the issues are in fact closely related. In arguing that there was no coverage for Maitland's loss, the Underwriters contend that Maitland must be "legally liable" for a DOE claim before there is a loss that the Underwriters are obligated to pay, and that many liability insurance policies require either that a claim be made or a suit for damages be brought before insurer liability is triggered. See 7 Couch on Ins. §§ 103:14-15 (3d ed. 1998). Since the DOE never made a claim against Maitland, the Underwriters argue that

17

their liability on the policy was not triggered.  We disagree.

The authority the Underwriters cite for the proposition that a "claim" is required to trigger liability merely states that "many policies of liability insurance" have such a requirement, but it does not address whether the Cover Note has such a requirement.  The Cover Note states, in pertinent part:

> This insurance is to indemnify or pay on behalf of the Insured(s) . . .  all sum(s) they may be **liable or obligated and/or responsible to pay as damages or by reason of the liability being imposed upon the insured whether it be assumed, under contract or otherwise**, arising out of the operation(s) of the Insured worldwide (emphasis added).

The Cover Note thus contains broad language, providing coverage where the insured becomes "liable or obligated and/or responsible to pay as damages."  The Cover Note's broad language distinguishes this case from the case law cited by the Underwriters, which deals with policies providing coverage where the insured has "become legally liable" or "legally obligated to pay as damages."  See Continental Oil Co v. Bonanza Corp., 706 F.2d 1365, 1374 (5th Cir. 1983); Data Specialties, Inc. v. Transcontinental Ins. Co., 125 F.3d 909, 911 (5th Cir. 1997).  It is uncontroverted that Offshore was responsible for damage to the pipeline as a result of the March 2 break, and that Section 21 of the DOE Contract held Maitland "fully responsible for all acts and omissions of [its] subcontractors."  The DOE repeatedly stated that it held Maitland responsible for the actions of its subcontractors and for the delays caused by the March 2 break.

18

Accordingly, there was sufficient evidence in the record for the jury to find that Maitland was "responsible to pay" for the damages caused by Offshore, and thus that Offshore's Cover Note covered Maitland's loss. Therefore, the district court correctly denied the Underwriters' motion for judgment as a matter of law on the coverage issue.

However, after determining that Offshore's Cover Note provided coverage for Maitland's loss, the district court found that there was insufficient evidence to support the jury's findings that Maitland faced potential liability to the DOE as a result of the damage caused by Offshore and that Maitland entered into a settlement to resolve that liability. We disagree with the district court's conclusion.

In support of its holding, the district court stated that there was no evidence from any Maitland witness that the DOE ever claimed that Maitland was responsible for the March 2, 1995 pipeline damage. However, at trial Appellants introduced a letter from the DOE dated March 9, 1995, holding Maitland responsible for its subcontractors' actions. Appellants also introduced a July 6, 1995 letter, holding Maitland responsible for the delays caused by the March 2, 1995 incident. These letters contradict the district court's conclusion that the DOE never claimed Maitland was responsible for the March 2 damage. Moreover, the Cover Note's broad language, indemnifying Maitland for all sums it "may be liable or obligated and/or responsible to

19

pay as damages," combined with the DOE Contract provision holding Maitland "fully responsible for all acts and omissions of [its] subcontractors," provides ample basis for the jury's conclusion that Maitland was potentially liable to the DOE. Thus, we hold that the district court erred in concluding that Maitland had no potential liability to the DOE, and reinstate the jury's finding to the contrary.

Appellants next contend that the district court erred in finding that Maitland and/or INA did not enter into a reasonable, prudent, and good-faith settlement with the DOE. Under Texas law, where an indemnitee enters into a settlement with a third party, it may recover from the indemnitor only upon a showing that potential liability existed, and that the settlement was reasonable, prudent, and in good faith under the circumstances. Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 721 n.15 (5th Cir. 1995). The settling indemnitee need not prove actual liability to the third party before recovering from the indemnitor. Id.

Appellants identify two settlements that could have formed the basis for the jury's conclusion that Maitland and/or INA entered into a settlement of Maitland's potential liability, (1) the McDermott Settlement and (2) the DOE Settlement. The Underwriters respond that because the DOE was not a party to the McDermott Settlement, it did not constitute a settlement of Maitland's potential liability to the DOE for Offshore's pipeline

20

break.  Underwriters further argue that the DOE Settlement provides no basis for liquidated damages for two reasons: (1) because Offshore's Cover Note did not cover the liquidated damages resolved by the DOE Settlement; and (2) the liquidated damages were not related to the pipeline damage caused by Offshore.

We agree with the Underwriters that the McDermott Settlement does not form the basis for indemnity; the DOE was not a party to the McDermott Settlement, and thus the settlement could not have resolved Maitland's potential liability to the DOE.  However, we disagree with the Underwriters' argument that the damages resolved by the DOE Settlement were not related to the Offshore pipeline damage.  Indeed, the DOE's July 6, 1995 letter explicitly holds Maitland responsible for the delay caused by the March 2 pipeline break.  Accordingly, whether the DOE Settlement satisfies the requirement of a reasonable, prudent, good-faith settlement of Maitland's potential liability to the DOE depends upon whether the Offshore Cover Note provided coverage for liquidated damages.  If so, Appellants have met the requirement for indemnification under Texas law.

The Underwriters, citing this Court's decision in Data Specialties, contend that liquidated damages are not recoverable under the Cover Note.  In Data Specialities, the plaintiff electrical contractor ("DSI") was hired to reconstruct an electrical system at a manufacturing facility in Texas. 125 F.3d

21

at 910.  In the course of DSI's work, a short circuit resulting in an explosion caused property damage to the electrical system. Id.  The explosion was caused by a defective circuit breaker for which DSI was not responsible.  Id.  DSI hired another electrical contractor to repair the damage, and sought reimbursement for the repair expenses under its commercial general liability ("CGL") policy.  Id.  When the insurer denied coverage, DSI brought suit, arguing that it was contractually obligated to repair the damage, and that because there was property damage, the CGL policy afforded coverage.  Id.  This Court held that the CGL policy did not cover a contractual obligation triggered by an event for which DSI was not at fault.  Id. at 913.

The crucial difference between Data Specialties and this case is that, unlike DSI, Maitland was at fault for the damage to the pipeline caused by Offshore.  Through the DOE Contract, Maitland assumed responsibility for the acts and omissions of its subcontractors, and thus was liable to the DOE for Offshore's tortious conduct.  Maitland therefore seeks coverage for contractual damages incurred as a result of conduct for which it was responsible.

The Underwriters next argue that this Court should not recognize liability for contractual damages here because the parties did not intend the Cover Note to afford coverage for contractual risks, citing Trinity Industries, Inc. v. Insurance Co. of North America, 916 F.2d 267 (5th Cir. 1990), and Bender

22

Shipbuilding & Repair Co. v. Brasileiro, 874 F.2d 1551 (11th Cir. 1989). However, neither Trinity nor Bender applies to this case. In Trinity, this Court held that an insured's builder's risk policy did not cover an arbitration award against the insured for repairs to correct its defective workmanship. 916 F.2d at 269. In reaching its decision, the Trinity court specifically distinguished cases holding that coverage existed where defective workmanship resulted in an accident. Id. at 270; see, e.g., Dow Chem. Co. v. Royal Indem. Co., 635 F.2d 379 (5th Cir. 1981). In Bender, the Eleventh Circuit held that a builder's risk policy did not cover a liquidated damages settlement against an insured for delayed construction of a dry dock. 874 F.2d at 1561. However, as in Data Specialities, the insured in Bender was not responsible for the damage to the dry dock that caused the delays. Rather, the delay resulted from storm damage to the dry dock during construction. Id. at 1553. Here, Maitland was responsible for the damage to the pipeline which directly caused the delay in its completion. Thus, the liquidated damages awarded against Maitland were a direct consequence of the March 2 pipeline break and are covered by the Cover Note, which provided coverage for "all other direct or indirect or **consequential** losses arising from or occasioned by the Insured's operations." Cover Note at Subsection I, ¶ B (emphasis added). Therefore, we conclude that the jury had sufficient evidence upon which to base its finding that the Cover Note covered Maitland's liquidated

23

damages, and reverse the district court's holding to the contrary.

## C.    Claim Requirement

Appellants assert that the district court erred in concluding that Maitland failed to make a claim to the Underwriters for damages and that, as a result, the Underwriters did not deny a claim.  Appellants alternately contend that (1) no claim was required, (2) Offshore's claim met the claim requirement, and (3) Maitland did in fact make a claim.

With respect to Appellants' first argument, the Cover Note specifically required that "in the event of any occurrence which may result in loss, damage and/or expense for which this Assurer may become liable, the Assured will use due diligence to give prompt notice thereof. . . ."  This language refutes Appellants' contention that no claim was required.

However, notice to the insurer of an incident or occurrence creating potential liability need not be made by the insured. P.G. Bell Co. v. United States Fid. & Guar. Co., 853 S.W.2d 187, 192 (Tex. App. 1993).  It is uncontroverted that Offshore made a claim on the Cover Note, which satisfies the requirement of prompt notice of the Offshore pipeline break.  Furthermore, Appellants presented evidence that Peter Comly, Maitland's comptroller, contacted Aberdeen and informed it of the accident and that Maitland was responsible under the DOE contract for Offshore's acts and omissions.  Accordingly, there was ample

24

evidence in the record upon which the jury could have relied in reaching its conclusion that Maitland satisfied the Cover Note's notice requirement. The district court thus erred in holding that Maitland did not make a claim.

Appellants also challenge the district court's determination that the Underwriters did not deny Maitland's claim. The court based this finding on its conclusion that Maitland did not make a claim, thus holding that the Underwriters could not have denied a claim. However, the record supports Appellants' contention that the Underwriters did in fact deny Maitland's claim. Appellants presented a fax from the Underwriters to Aberdeen indicating that the Cover Note had been cancelled and that the claims were outside the policy period, as well as Aberdeen's letter to Peter Comly attaching the Underwriters' fax, which stated that the claims based on Offshore's pipeline damage were "of no concern to Underwriters." This evidence provides ample support for the jury's finding that the Underwriters denied Maitland's claim. In light of our holding that there was sufficient evidence in the record to support the jury's finding that Maitland did make a claim on the Cover Note, as well as the evidence presented by Appellants that the Underwriters denied Maitland's claim, we conclude that the district court erred in holding that the Cover Note did not obligate the Underwriters to compensate Maitland for its loss.

**D. Damages**

The Underwriters assert that the district court erred in denying their motion for judgment as a matter of law concerning the reasonableness of Maitland's repair efforts and Appellants' attempt to segregate damages between the February 6 and March 2 pipeline breaks.  In reviewing a district court's denial of a motion for judgment as a matter of law, we must uphold the verdict unless there was no legally sufficient evidentiary basis for a reasonable jury to find as it did.  Fed.R.Civ.P. 50(a)(1); Hiltgen v. Sumrall, 47 F.3d 695, 700 (5th Cir. 1995).

Applying this standard, we conclude that there is ample evidence in the record to support the jury's conclusion that Maitland's attempts at repair were reasonable and made in good faith.  The repair strategies were discussed with and approved by the DOE.  In short, the Underwriters have failed to demonstrate that Maitland's repairs were unreasonable, imprudent, or made in bad faith, under the circumstances that existed at the time the repairs were attempted.  Accordingly, we affirm the district court's denial of the Underwriters' motion for judgment as a matter of law as to the reasonableness of Maitland's repair efforts.

The Underwriters also contend that in calculating their damages, Appellants did not properly segregate the repair costs associated with the February 6, 1995 pipeline break from the repair costs incurred as a result of the March 2 Offshore break.

26

In support of their segregation of damages, Appellants offered the testimony of witnesses who examined every invoice and described how each applied to the repairs of the March 2 pipeline break.

The Underwriters cite numerous cases in support of the proposition that recovery cannot be had for damages that are speculative or conjectural in nature. See, e.g., Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994); A.B.F. Freight Sys., Inc. v. Austrian Import Serv. Inc., 798 S.W.2d 606, 615 (Tex. App. 1990). However, these cases are inapposite to the situation here. For instance, in Teletron, the court held that the plaintiff's claim for lost profits was speculative in light of its inability to produce a working model of the product. 877 S.W.2d at 281. Similarly, in A.B.F. Freight Systems, the plaintiff admitted there was no way of segregating the damaged goods and presented no objective facts in support of its estimated damages. 798 S.W.2d at 615.

The Underwriters correctly note that "damages must be ascertainable in some manner other than by mere speculation or conjecture, or by reference to some fairly definite standard, established experience, or direct inference from known facts." Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 939 F.2d 1176, 1188 (5th Cir. 1991) (citing Berry Contracting, Inc., v. Coastal States Petrochemical Co., 635 S.W.2d 759, 761 (Tex. App. 1982)). In this case, Appellants based their damages

27

segregation testimony on the established experience of Derf Maitland, Maitland's president, in the construction industry and the day-by-day itemization of charges contained in the various invoices from International Diving and Consulting Services ("International Diving"). Mr. Maitland also testified that he was positive that everything International Diving did on the project was related to the March 2 pipeline break. Viewing the evidence in the light most favorable to the verdict, Maitland presented sufficient evidence to support the jury's damages verdict.

Finally, Maitland and INA appeal the district court's holding that there was no evidence to support the jury's verdict that the amount of damages Appellants incurred in settling with the DOE was $3,827,798.76. Although it concluded that the jury properly resolved the issues of Maitland's segregation of damages and reasonable repair efforts, the district court nonetheless overturned the jury's verdict as to the amount of damages based on its conclusion that there was no evidence that Maitland or INA settled with the DOE. In light of our holding that Maitland and INA entered into a settlement with the DOE arising from the damage caused to the pipeline by Offshore and the resultant delay in completion of the project, we hold that the district court erred in overturning the jury's verdict solely based on its belief that no such settlement existed.

**IV.**

28

Because we find that substantial evidence supported the jury's verdict in this case, we REVERSE the district court's partial grant of the Underwriters' motion for judgment as a matter of law, AFFIRM the district court's denial in part of the Underwriters' motion, and REMAND to the district court with instructions to enter judgment in accordance with the jury's verdict.